Ashley **LANDSTROM**, et al., Plaintiffs,

v.

**ILLINOIS DEPARTMENT OF CHILDREN AND FAMILY SERVICES,** et al., Defendants.

No. 87 C 3423.

United States District Court,
N.D. Illinois, E.D.

Oct. 31, 1988.

---

**1272**

Dennis E. Carlson, Chicago, Ill., for plaintiffs.

James O. Nolan, Katharine G. Hill, Clausen Miller Gorman Caffrey & Witous, P.C., Chicago, Ill., for all defendants except Harris.

Neil F. Hartigan, Atty. Gen. of Illinois, Kathleen Kreisel Flahaven, Asst. Atty. Gen., Chicago, Ill., for defendant Harris.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Ashley and Lara Landstrom ("Ashley" and "Lara" respectively), two grammar school students in Barrington School District 220 ("District"), and their parents Paul Landstrom ("Paul") and Jane Jensen (collectively "Parents") have sued District and four of its employees (collectively "District Employees")—teacher Maggie Gruber ("Gruber"), principal Marie Plozay ("Plozay"), nurse Mary O'Boyle ("O'Boyle") and psychologist Lorenz Petersen ("Petersen"):

 1. charging violations of plaintiffs' constitutional rights in the course of a child abuse investigation (in this respect plaintiffs' claims are brought under 42 U.S.C. § 1983 ("Section 1983")); and

 2. asserting pendent claims for false arrest, false imprisonment, battery, intentional or reckless infliction of emotional distress, negligent malpractice and wilful-wanton conduct.

Plaintiffs also claim similar violations by Illinois Department of Children and Family Services ("DCFS") employee David Harris ("Harris").

All defendants except Petersen have moved to dismiss the Fifth Amended Complaint (the "Complaint") under Fed.R.Civ.P. ("Rule") 12(b)(6).[1] For the reasons stated in this memorandum opinion and order:

 1. Count I is dismissed as to the individual defendants but not as to District.

 2. Count II is dismissed in its entirety.

 3. Counts III through VI are dismissed as to the individual defendants under the principles of *United Mine Workers v. Gibbs*, 383 U.S. 715, 726–27, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966).

 4. District's motion to dismiss Count IV is denied.

 5. District's motion to dismiss Counts V and VI is granted.

### Facts [2]

On March 17 Gruber removed Ashley from her first grade class (¶ 19). District Employees and apparently Harris as well,[3]

---

**1.** Petersen was first added as a new party defendant in the Fifth Amended Complaint, and this opinion was prepared on the assumption he had been served but his responsive pleading was not yet due. When the rulings in this opinion were announced in open court October 31, plaintiffs' counsel said he was unaware (!) whether he had caused process to issue against Petersen after leave was granted to file the Complaint naming him. However, plaintiffs' counsel then acknowledged the same legal principles would apply to Petersen as to the other District Employees and therefore waived any potential objection based on Petersen's not having been served or responded to the Complaint. As for the remaining defendants, one motion to dismiss was filed by Distict and its employees, the other by Harris.

**2.** Rule 12(b)(6) principles require this Court to accept as true all plaintiffs' well-pleaded factual allegations, drawing all reasonable inferences in plaintiffs' favor (*Marmon Group, Inc. v. Rexnord, Inc.*, 822 F.2d 31, 34 (7th Cir.1987) (per curiam)). All Complaint allegations will be cited "¶ —." Because all relevant events occurred in 1987, no year designations are included.

**3.** "Apparently" is used because ¶ 19 alleges the examination took place in the presence of "David O. Harris, the latter on inference only." Just what plaintiffs' lawyer means by that is unclear. However, in an effort to give plaintiffs every benefit of the doubt, this Court assumes they have expressed an allegation similar to one made "on information and belief" (permissible under the Rules, 5 Wright and Miller, *Federal Practice and Procedure* § 1224, at 155 (1969)). Accordingly this opinion assumes Harris was present.

acting in concert, conducted an oral and physical examination of Ashley because she had complained of soreness in her rear end (*id.*). During the examination Gruber physically restrained Ashley and O'Boyle removed her underpants (*id.*).

On March 18 Paul notified Plozay he disapproved of Ashley's treatment and instructed Plozay not to engage in such conduct again (¶ 21). Nevertheless, on March 19 Plozay removed Lara from her classroom (¶ 22). Plozay and Petersen (and perhaps Harris and O'Boyle [4]) then questioned Lara about her sister's complaint of soreness and about Parents' conduct (*id.*). Lara was not physically examined.

Harris then telephoned Parents, insisting they and the children meet with him for further inquiry about whether there had been parental child abuse (¶ 24). Parents responded that any such meeting must occur in the presence of their attorney (*id.*). Despite that, on April 7 Harris telephoned Parents' attorney to say the children would be questioned that day.[5] Over the attorney's objection, Harris, Plozay, Petersen and perhaps O'Boyle [6] questioned Ashley at school (in the absence of either Parents or their attorney) regarding the suspected abuse (¶¶ 26-27). Plozay physically restrained Ashley during that interrogation (¶ 27).

### Count I

Count I asserts a Section 1983 claim by Ashley and Lara against all defendants. Specifically ¶ 32 alleges defendants' conduct:

violated the civil rights of these children to be free from the use of unnecessary and unjustified use of force upon them, the wilful or intentional deprivation of the care, security and sustenance of their natural parents by agents of the government, to be free from improper detention or arrest and imprisonment, and from unreasonable search and seizure by agents, employees and servants of the government of any state of [sic] local authority and the right to be represented by counsel in any attempt to infringe upon any of the foregoing civil rights which they enjoy by reason of the due process clause of the 14th Amendment to the United States Constitution and the Fourth Amendment thereto.[7]

Ashley and Lara seek compensatory damages in an unspecified amount plus $100,-000 in punitive damages against each individual defendant, as well as costs and attorney's fees.

1. Individual Defendants (Gruber, Plozay, O'Boyle, Petersen and Harris)

■ All individual defendants have clearly been sued in their individual and not their official capacities (¶ 34). But as this Court's September 16, 1987 memorandum opinion and order (*"Landstrom I"*) [available on WESTLAW, 1987 WL 17487] pointed out in dealing with an earlier version of the Complaint (plaintiffs' second attempt to state their claims), government officials (such as the individual defendants here) who are engaged in discretionary functions are entitled to qualified immunity from money damages unless the conduct violated "clearly established statutory or constitu-

---

**4.** Again the Complaint is unclear on who was present. Specifically ¶ 22 says:

> Marie Plozay took Lara Ashley into the presence of herself, Lorenz Petersen, and or Dave Harris and Mary O'Boyle, who had gathered and assembled for the interrogation of Lara Landstrom....

For the same reason as stated in n. 3, this opinion assumes both Harris and O'Boyle were there.

**5.** As in plaintiffs' earlier pleadings, ¶ 26 alleges direct communications between Harris and plaintiffs' lawyer, who also represents them in this action. That may well pose a problem under Code of Professional Responsibility DR

5–101(B) and 5–102(A) (the "lawyer-witness rule") unless one or more of the stated exceptions in DR 5–101(B) applies. For current purposes, though, the allegations as to such communications are accepted as "well-pleaded."

**6.** O'Boyle is alleged to have been present "on inference alone" (¶ 27). Again this opinion assumes she was there.

**7.** [Footnote by this Court] As an initial matter, given the Complaint's earlier substantive allegations, ¶ 32 is incorrect in asserting "the use of unnecessary and unjustified use of force" and "unreasonable search and seizure" as to both children rather than as to Ashley alone.

tional rights of which a reasonable person would have known" (*Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982)). It is plaintiffs' burden to show the constitutional right was "clearly established" (*Abel v. Miller,* 824 F.2d 1522, 1534 (7th Cir.1987), quoting *Davis v. Scherer,* 468 U.S. 183, 197, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984)).[8]

As the extended quotation from ¶ 32 demonstrates, Ashley and Lara charge a panoply of alleged constitutional violations. To that end plaintiffs rely (as they have in their earlier memoranda) on *Darryl H. v. Coler,* 801 F.2d 893 (7th Cir.1986) to establish their constitutional rights. And as in *Landstrom I,* this Court again rejects that analysis.

*Darryl H.* challenged DCFS policies calling for nude visual inspections of children suspected of being the victims of child abuse—a challenge that did raise constitutional doubts (801 F.2d at 903–04). Our Court of Appeals confirmed such nude inspections are "searches" within the scope of the Fourth Amendment (*id.* at 900).[9] It further recognized such investigations implicate "the closely related legitimate expectations of the parents ..., protected by the fourteenth amendment, that their familial relationship will not be subject to unwarranted state intrusion" (*id.* at 901). But the opinion (*id.* at 902) also stressed the "extraordinarily weighty" interests and obligations of the state in protecting children from physical abuse. Consequently the Court of Appeals was unable to determine whether the *Darryl H.* plaintiffs' constitutional rights had been violated at all, much less to enunciate a rule that all nude inspections of children in the course of a child-abuse investigation violate constitutional rights (*id.* at 908).

Just what plaintiffs hope to make of *Darryl H.* is unclear. Presumably they believe that case supports all their ¶ 32 allegations. But *Darryl H.* plainly does not strip the individual defendants of qualified immunity. As was true in *Darryl H.* itself, the constitutionality of the individual defendants' actions here can be determined only by balancing the state's "extraordinarily weighty" interests and multifaceted obligations (*id.* at 902) against the severity of the intrusion into protected personal interests. By definition that inquiry must proceed on a case-by-case basis. As noted in *Landstrom I,* for any defendant to be stripped of qualified immunity in that situation "the facts of the existing case law must closely correspond to the "contested action" (*Benson v. Allphin,* 786 F.2d 268, 276 (7th Cir.1986)). And *Darryl H.* had set out no factual roadmap of constitutionally violative conduct against which defendants here could have measured their own proposed course of conduct.

Landstrom Mem. 2–5[10] cites *Murray v. City of Chicago,* 634 F.2d 365 (7th Cir. 1980) for the proposition that "[n]ude searches of adults and children of tender years are offensive without tomes of law." But *Murray,* which involved a constitutional challenge to a nude search of a woman arrested under a withdrawn arrest warrant, clearly has no application to the qualified immunity issue here.

Landstrom Mem. 1–3 also points to *Lester v. City of Chicago,* 830 F.2d 706 (7th Cir.1987). That case involved a Section 1983 challenge to an arrest by two Chicago police officers. Lester alleged the absence of probable cause and the use of excessive force. On appeal the jury verdict for the officers on the probable cause claim was upheld, but the case was remanded for a new trial on the excessive force charge. Overruling *Gumz v. Morrissette,* 772 F.2d

---

**8.** In the present context, of course, plaintiffs need not actually "show" anything. Rather they must sufficiently plead a "clearly established constitutional right" to enable the Complaint to survive the Rule 12(b)(6) hurdle.

**9.** As always, for convenience and because of the universality of the practice this Court refers to the underlying Bill of Rights provision rather than citing more precisely to the Fourteenth

Amendment (which is necessarily in issue where state actors are involved).

**10.** Plaintiffs filed two responsive memoranda. Their response to the motion by District and its employees will be cited "Landstrom Mem. 1—," while their response to Harris' motion will be cited "Landstrom Mem. 2—."

1395 (7th Cir.1985), *Lester,* 830 F.2d at 710 held "that the proper standard for analyzing excessive force in arrest claims is a Fourth Amendment standard."

*Lester* obviously has no application to this case either. Lara and Ashley were never "arrested," nor did defendants' alleged actions as to Ashley at all resemble the excessive force at issue in *Lester.* In sum, the facts of *Lester* are not even close to corresponding to the facts here.[11]

So much, then, for plaintiffs' efforts to place the actions taken as to either child outside any "clearly established" constitutional norm. And plaintiffs fare no better in attempting to invoke a constitutional "right to counsel." As *United States v. Gouveia,* 467 U.S. 180, 187, 104 S.Ct. 2292, 2296, 81 L.Ed.2d 146 (1984) makes clear, even in the criminal context "the right to counsel attaches only at or after the initiation of adversary judicial proceedings against the defendant." No such adversary proceeding has been initiated in this case, and there is certainly no established right to counsel in the controversy described in the Complaint when viewed in civil terms.

This discussion has been prolonged more than was really necessary, simply to demonstrate that plaintiffs have cited no cases (nor has this Court found any) even remotely suggesting either Harris' or District Employees' actions violated plaintiffs' clearly established constitutional rights. That being so, all individual defendants enjoy qualified immunity from a suit for damages. Plaintiffs' Count I claim for damages against the individual defendants is dismissed.[12]

**2. District**

■ None of the discussion to this point exonerates District, which is not entitled to claim the mantle of qualified immunity (*Owen v. City of Independence,* 445 U.S. 622, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980)). And District's potential liability remains because, notwithstanding the prior analysis, it remains true that in some respects plaintiffs have alleged colorable constitutional violations. For instance, *Darryl H.* has said nude examinations must be "reasonable"—a determination that rests on all the surrounding circumstances—and the gist of plaintiffs' Complaint is that District (acting through its employees) unreasonably examined Ashley. That at least raises the possibility of a Fourth Amendment violation.

To double back a bit, what the earlier analysis established was that such allegations—even though accepted as true—do *not* divest the individuals of qualified immunity. What may ultimately be held an "unreasonable" search by District's employees after the fact-intensive inquiry mandated by *Darryl H.* is not equivalent to their having violated what was already a "clearly established right." Violation of a clearly established right requires ex ante knowledge that such conduct is prohibited —something not possible in this case.

■ As to District, however, this Court remains free to make an ex post determination that the examination was unreasonable.[13] For that quite different purpose,

---

**11.** Landstrom Mem. 2–5 also cites *Santosky v. Kramer,* 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982). Though *Santosky* does confirm a "fundamental liberty interest of natural parents in the care, custody, and management of their child" (*id.* at 753, 102 S.Ct. at 1394), it does not supply the "clearly established constitutional right" plaintiffs seek. *Santosky* simply held that before a state can terminate such parental interests upon a finding of neglect, due process requires a clear and convincing evidentiary showing.

**12.** Because qualified immunity is an affirmative defense that ordinarily calls for factual submissions, it usually leads to summary judgment under Rule 56 (*Harlow,* 457 U.S. at 815–18, 102

S.Ct. at 2736–37). In this instance the Complaint itself demonstrates plaintiffs' failure to allege the violation of any clearly established right, with no additional facts needed for that legal determination. Hence dismissal follows under Rule 12(b)(6) for failure to state a claim upon which relief can be granted.

**13.** To pursue the distinction between such a determination and the qualified immunity determination one step further, after this and other courts have made such ex post decisions to a sufficient degree that the conduct they deal with would reach the "clearly established" level, those decisions would then serve as notice to all state actors that their *future* conduct must not

this opinion now turns to the requirements for establishing municipal liability.

School District 220 is an Illinois municipal corporation. As noted in *Landstrom I,* municipal corporate liability must be direct and not derivative. Accordingly, the Constitution-violative conduct must be that of the corporate policymaker for that particular activity (*Pembaur v. City of Cincinnati,* 475 U.S. 469, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986); *City of St. Louis v. Praprotnik,* —— U.S. ——, 108 S.Ct. 915, 99 L.Ed. 2d 107 (1988)) or, failing that, must be the product of an official policy or custom of the municipality (*Monell v. New York City Department of Social Services,* 436 U.S. 658, 694, 98 S.Ct. 2018, 2037, 56 L.Ed.2d 611 (1978)). To invoke the latter alternative, however, a plaintiff cannot merely assert the existence of a policy or custom without alleging specific facts evidencing the existence of the policy or custom (*Strauss v. City of Chicago,* 760 F.2d 765, 767–70 (7th Cir.1985)).[14]

Plaintiffs try to travel both roads to municipal liability. In *Monell*-evocative terms, ¶ 13 alleges a three-pronged custom, practice or procedure for dealing with suspected child abuse:

> Said defendants had arrived at a custom, practice, procedure or program which they had agreed to or acquiesced in by which they had or would undertake to investigate any complaint by any child, of any consequence or substance or lack thereof, that might involve the mere subjective suggestion of mental or physical discomfort or pain whether a probable, possible, likely or unlikely result of conduct of parents administered with or without reasonable cause in just measure, properly, improperly or not, by subjecting such students to immediate detention, restraint on freedom of movement beyond restraints required for the purpose of school instruction, to interroga-

tion by groups of staff, to invasive physical examination of the body, person and private parts of such students as well as by group interrogation of other students whether siblings of the supposed victims or not who happen to be subject to defendant's control.

That allegation is expanded in the four ensuing paragraphs of the Complaint, which will not be reproduced here. Suffice it to say that plaintiffs allege a policy of investigation, interrogation and examination following any student's complaint, conducted regardless of the reliability of the information or of the threat to the child.

It need not be decided for certain whether simply stating the existence of such a policy, without also adducing any instance of its implementation other than the specific episodes affecting plaintiffs, meets the demands of *Strauss.* Even if it does not (and that appears the right answer, in view of *Strauss'* insistence on fact-specific rather than conclusory pleading), plaintiffs can still survive against District because they satisfy the *Pembaur–Praprotnik* requirements.

Justice Brennan's plurality opinion in *Pembaur,* 475 U.S. at 483–84, 106 S.Ct. at 1300 said "municipal liability under § 1983 attaches where—and only where—a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." Municipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances (*id.* at 480, 106 S.Ct. at 1298), but (*id.* at 481–83, 106 S.Ct. at 1299–1300) (citations and footnotes omitted):

> Municipal liability attaches only where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered. The fact

infringe upon the then-established constitutional norms. That would in turn strip such future actors of qualified immunity pro tanto.

**14.** This Court has previously expressed its concern as to the Catch–22 potential in *Strauss'* demand for fact pleading from plaintiffs who have not had the opportunity to engage in the discovery needed to learn of other instances evidencing the alleged policy or custom (see, e.g., *Payne v. City of LaSalle,* 610 F.Supp. 606 (N.D.Ill.1985)). But as in *Payne,* this Court of course applies *Strauss,* the binding precedent in our Circuit.

that a particular official—even a policy-making official—has discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on an exercise of that discretion.... The official must also be responsible for establishing final government policy respecting such activity before the municipality can be held liable. Authority to make municipal policy may be granted directly by a legislative enactment or may be delegated by an official who possesses such authority, and of course, whether an official had final policymaking authority is a question of state law.

*Praprotnik,* 108 S.Ct. at 926 does not alter the analysis for current purposes, although the plurality's strict standard there certainly makes plaintiffs' ability to *prove* final policymaking authority under state law a much tougher task. And what must be viewed as the Court's *holdings* in *Pembaur* and *Praprotnik* are satisfied by the Complaint's allegations as well.

Here ¶ 6 says Petersen was "charged with the formulation and administration of school policy and reporting under the Abused and Neglected Child Reporting Act." And ¶ 8 says as to Plozay:

[W]hen and where specific policy, custom, rules or practice were not immediately recalled or not known, she was charged with the responsibility of creating such policy, practice or custom with the advice and consent of her subordinates and at large District personnel such as, and including but not limited to, Lorenz Petersen.

While those allegations do not expressly say Petersen and Plozay were responsible for establishing *final* policy in the relevant respects, at this threshold stage it is reasonable to infer they were (see n. 2). Defendants provide no authority to the contrary. With the Complaint read in the re-

quired expansive manner, plaintiffs have laid the necessary foundation in *Pembaur–Praprotnik* terms. District's motion to dismiss Count I is denied.

### Count II

 Count II advances a Section 1983 claim against Harris, Petersen, Plozay and District for violation of Parents' asserted First Amendment rights of free expression and speech. Parents allege that after Ashley's initial examination Paul complained to Plozay (¶ 21), instructing her to "cease and desist from further inquiry of plaintiffs' children" (¶ 36). Parents also objected to Harris against any further inquiries of the children, at least without Parents and their attorney present (¶ 24).

According to Parents (¶ 36):

Said defendants [Petersen and Plozay] chose to punish plaintiffs' proper exercise of their freedom of speech by conducting further interrogation of said children into the affairs of the plaintiffs in order to cow them into submission to defendants' personal whims, desires, lust for power and control, to secure their own continued employment positions and for their own self agrandizement [sic].

In addition, ¶ 38 says Harris retaliated against Parents for their criticism of him, his superiors and DCFS. Count II seeks compensatory damages in an unspecified amount against each named defendant, plus punitive damages of at least $100,000 against each named individual defendant, together with costs and attorney's fees.

*Pickering v. Board of Education of Township High School District 205, Will County,* 391 U.S. 563, 573, 88 S.Ct. 1731, 1737, 20 L.Ed.2d 811 (1968) [15] teaches the "core value" of the First Amendment's Free Speech Clause is the "public interest in having free and unhindered debate on matters of public importance." [16] Working

---

**15.** It was this Court's good fortune, while in the private practice of law, to have written and filed the amicus curiae brief in *Pickering* in support of the position the Court then took.

**16.** See also *Consolidated Edison Co. of New York v. Public Service Comm'n of New York,* 447 U.S. 530, 534, 100 S.Ct. 2326, 2331, 65 L.Ed.2d 319

(1980) (quoting *Thornhill v. Alabama,* 310 U.S. 88, 101–02, 60 S.Ct. 736, 743–44, 84 L.Ed. 1093 (1940)):

this Court has emphasized that the First Amendment "embraces at the least the liberty to discuss publicly and truthfully all matters of public concern...."

from that premise, *Connick v. Myers*, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983) has provided the definitive framework for analyzing First Amendment claims, with the first step being an ascertainment of whether the asserted speech touches upon a matter of public concern.[17] Only if the speech at issue passes that first hurdle must a court dealing in the employer-employee context then employ a balancing test to determine whether, as a matter of law, the speech is constitutionally protected.[18]

*Connick, id.* at 147–48, 103 S.Ct. at 1690 says whether speech addresses a matter of public concern must be determined by the content, form and context of a given statement, as revealed by the whole record.[19] In that respect the key inquiry is the plaintiffs' goal in making the speech. As *Linhart v. Glatfelter*, 771 F.2d 1004, 1010 (7th Cir.1985) (emphasis in original) has put it: [20]

> The [*Connick*] test requires us to look at the *point* of the speech in question: was it the employee's point to bring wrongdoing to light? Or to raise other issues of public concern, because they are of public concern? Or was it the point to further some purely private interest?

And *Callaway*, 832 F.2d at 417 similarly teaches: [21]

While the content of [the employee's] communications touched upon an issue of public concern generally, she was not attempting to speak out as a citizen concerned with problems facing the school district; instead she spoke as an employee attempting to resolve her private dilemma.

To be sure, if defendants' complained-of conduct was indeed a manifestation of a general pattern, Parents' private remonstrances could also be said to touch upon a matter of public concern. But in the employee situation that alone does not establish a First–Amendment-based claim. Both the content of Parents' complaints and the persons to whom they were communicated—the alleged wrongdoers themselves—are the hallmarks of private complaints about individual treatment (the very same kind of conduct *Callaway* and *Phares* accurately described as "attempting to resolve [one's] private dilemma"). On Parents' own allegations, they made no attempts to expose wrongdoing or to inform the public of problems with the school's procedure for the investigation of alleged abuse (cf. *Phares*, 856 F.2d at 1008).

In the public employee situation, *Phares, id.* at 1009, has said flat out that a person "the main thrust of [whose] speech was to 'further some purely private interest' " (quoting *Linhart*, 771 F.2d at 1010) simply

---

**17.** *Pickering, Connick* and later lower court opinions engaging in that first-step analysis have all involved First Amendment claims by public employees against their state employers for alleged retaliation against the exercise of constitutional rights. Neither side here has cited, nor has this Court found, any cases involving (as here) private citizens claiming retaliation by state actors. But certainly the public employment cases provide a useful starting point as to what constitutes the *exercise* of First Amendment rights, which is the focus of this opinion. After that scrutiny, this opinion will turn *to considering whether there is any* conceptual difference in First Amendment terms between the public employee situation and that of plaintffs.

**18.** At least in the public employment context, if the speech is then found constitutionally protected under the balancing test, two factual issues arise. First, were a defendant's actions in fact motivated by the protected speech? Second, if a plaintiff establishes the speech was a substantial or motivating factor in a defendant's decision, can defendant prove he or she would have taken the same action in the absence of plaintiff's exercise of First Amendment rights? Cf. *Belk v. Town of Minocqua*, 858 F.2d 1258, 1262 & n. 6 (7th Cir.1988). Because the speech at issue here does not survive the threshold inquiry, it need not be decided whether those later steps are also the appropriate path to take in the non-employee situation.

**19.** In this instance, of course, the "whole record" is the Complaint—and that means Paul's objection and directive to Plozay, followed by Parents' later telephone demurrer to Harris.

**20.** This statement of the operative law remains valid today: It was quoted verbatim in *Callaway v. Hafeman*, 832 F.2d 414, 417 (7th Cir.1987).

**21.** This statement has in turn just been quoted in *Phares v. Gustafsson*, 856 F.2d 1003, 1008 (7th Cir.1988).

"has not presented a first amendment claim." That may be an oversimplified shorthand for what *Connick*, 461 U.S. at 147, 103 S.Ct. at 1690 (citations omitted) has said at greater length:

> We do not suggest, however, that Myers' speech, even if not touching upon a matter of public concern, is totally beyond the protection of the First Amendment. "[T]he First Amendment does not protect speech and assembly only to the extent it can be characterized as political. 'Great secular causes, with smaller ones, are guarded.'" ... We in no sense suggest that speech on private matters falls into one of the narrow and well-defined classes of expression which carries so little social value, such as obscenity, that the State can prohibit and punish such expression by all persons in its jurisdiction.... For example, an employee's false criticism of his employer on grounds not of public concern may be cause for his discharge but would be entitled to the same protection in a libel action accorded an identical statement made by a man on the street. We hold only that when a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior.

What is thus surely true in the employment situation—and what this Court holds true as to Parents as well—is that the distinction between speech as to personal interests and speech as to public concerns must be preserved. If a private complaint about a public actor's wrongdoing were automatically converted into "a matter of public concern" for First Amendment purposes simply *because* (1) the actor was a public person and (2) the conduct was wrongful, the first step in *Connick* would be rendered totally meaningless—by definition there could never be any First–Amendment-unprotected activity.

But to return to *Connick* and its progeny, it may perhaps be thought they could prove too much if translated with full vigor to a nonemployee citizen's statement upon a matter of personal interest. No public official should be permitted to muzzle a private individual with impunity on matters purely personal to that individual either. Where Parents fail here, however, is in trying to bootstrap their "Don't do it again" statements made to Plozay and Harris alone, followed by defendants "doing it again," into a claim charging First–Amendment-violative conduct by defendants. If Parents have a substantive claim arising out of defendants' conduct *itself* being unconstitutional (the subject matter of Count I), so be it. But Parents' Count II claim, to paraphrase *Connick*, 461 U.S. at 139, 103 S.Ct. at 1685, is not one of "the most unusual circumstances" in which "a federal court is ... the appropriate forum in which to review the wisdom of [the] decision taken by [the] public agency allegedly in reaction to [Parents'] behavior."

Because this thought is elusive,[22] it may be profitable to reframe the analysis a bit. What seems to be the clue is that what is at issue is not censorship of the speaker, but rather whether the reactive conduct by the person spoken to is actionable at law. In that sense the decision does not at all implicate the tension between Justice Black's absolutist view of the First Amendment and the otherwise universal view that at least some speech is unprotected. When *Phares* says that a lawsuit that is the ultimate outgrowth of an employee's speech as to her purely personal interests "has not presented a first amendment claim," what that has to mean is merely that the employer's response to such speech by disciplining the employee, if otherwise reasonable under all the circumstances, is not actionable

---

22. When is speech not "speech" for First Amendment purposes? After all, the government employees *spoke* in *Connick* and all its progeny, just as Parents *spoke* to Plozay and Harris. Yet the court said in *Phares*, 856 F.2d at 1009 that a complaint about the employer's adverse personnel action in reaction to that speech "has not presented a first amendment claim."

under Section 1983.[23] In the same way, if defendants' reaction to Parents' "Don't do it again" admonition—that is, by doing it again anyway—was otherwise reasonable under all the circumstances, that response itself is not actionable under Section 1983. But that (the very reasonableness of defendants' conduct) is precisely the matter at issue in Count I, so that Count II does not represent a separate claim merely by being cloaked in First Amendment guise. Hence Parents' "speech," involving as it did their purely personal complaints, cannot support their purported First Amendment claim in Count II.[24]

One other point. Even if Parents' speech were viewed otherwise in First Amendment terms, Count II would still fail as to the individual defendants (Harris, Petersen and Plozay) because they are certainly entitled to qualified immunity. If the just-completed discussion has shown anything at all, it has surely demonstrated that the charged conduct did not breach any "clearly established" constitutional right in First Amendment terms.

In all events, Count II is dismissed on substantive grounds as to District and on both substantive and qualified immunity grounds as to the individual defendants. Nor will Parents be afforded still another chance for creative reconstruction of the facts or law in this area.

### Pendent Claims

In the absence of total diversity of citizenship (not present here), this Court's jurisdiction over plaintiffs' state law claims exists only under pendent jurisdiction. That being true, *UMW v. Gibbs*, 383 U.S. at 726, 86 S.Ct. at 1139 (footnote omitted) tells us:

> Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well. Similarly, if it appears that the state issues substantially predominate, whether in terms of proof, of the scope of the issues raised, or of the comprehensiveness of the remedy sought, the state claims may be dismissed without prejudice and left for resolution to state tribunals.

■ Except for the now-narrowly-circumscribed concept of pendent *party* jurisdiction, subject matter jurisdiction must of course exist independently as to each and every defendant (see *Bernstein v. Lind-Waldock & Co.*, 738 F.2d 179, 187–88 (7th Cir.1984)). Both federal claims have now been dismissed against the individual defendants. No good reason counsels the exercise of pendent jurisdiction over plaintiffs' numerous state law claims against them. If this Court were to apply the "embattled concept" of pendent-party jurisdiction to keep those defendants in this lawsuit on some "common nucleus of operative fact" notion (see *Bernstein, id.* at 187 and the Supreme Court cases discussed there), that would subvert the basic principle that qualified immunity is intended to free public officials from being sued and having their work disrupted, as well as from ultimate liability (*Harlow*, 457 U.S. at 814, 816–18, 102 S.Ct. at 2736, 2737–38). Accordingly, Counts III through VI are dismissed as to the individual defendants.

**23.** This analysis also meshes perfectly with the sense in which *Belk*, 858 F.2d at 1262 (citation and footnote omitted) has just said:
> [The employer] could not, however, terminate [the employee's] employment because of her exercise *or threatened exercise* of a constitutionally protected right.... Thus, only if the substance of [the employee's] threatened grievance is deserving of first amendment protection does her allegedly retaliatory discharge violate the petition clause [of the First Amendment].

**24.** This entire just-completed section of this opinion owes a great deal, as does all of this Court's thinking and writing in the First Amendment area, to the great First Amendment scholar, the late Professor Harry Kalven, Jr. Even the briefest of dips into (let alone any extensive reading in) *A Worthy Tradition: Freedom of Speech in America*—the newly-published version of the manuscript left uncompleted at Professor Kalven's untimely death and edited by his son Jamie and another outstanding scholar, Professor Owen Fiss—reminds us of just how great our loss in insights into the First Amendment has been with the loss of Professor Kalven. It need scarcely be added that if there are any flaws in analysis here, they are *not* ascribable to him or to his works.

On the other hand, this Court does have federal jurisdiction over District on plaintiffs' Count I Section 1983 claims. It is therefore appropriate to look at the sufficiency of the allegations in the remaining counts as to District.

### 1. Count III

Count III states claims for false arrest, imprisonment and battery—but only against the individual defendants, not District. That Count is dismissed.

### 2. Count IV

In Count IV Lara and Ashley assert claims of intentional or reckless infliction of emotional distress. *Farnor v. Irmco Corp.*, 73 Ill.App.3d 851, 854–55, 29 Ill.Dec. 894, 898, 392 N.E.2d 591, 595 (1st Dist. 1979) (citations omitted) outlines the elements of a cause of action for intentional infliction of emotional distress:

> extreme and outrageous conduct by the defendant; intent by the defendant to cause, or a reckless disregard of the probability of causing emotional distress; severe or extreme emotional distress suffered by the plaintiff, and an actual and proximate causation of emotional distress by the defendant's outrageous conduct.

That is a capsulized version of the definitive (for Illinois) analysis of the tort in *Public Finance Corp. v. Davis*, 66 Ill.2d 85, 89–90, 4 Ill.Dec. 652, 654, 360 N.E.2d 765, 767 (1977) (emphasis in original):

> First, the conduct must be extreme and outrageous. The liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions or trivialities. "It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible

bounds of decency * * *." Restatement (Second) of Torts sec. 46, comment *d* (1965).

> Second, infliction of emotional distress alone is not sufficient to give rise to a cause of action. The emotional distress must be *severe*. Although fright, horror, grief, shame, humiliation, worry, etc. may fall within the ambit of the term "emotional distress," these mental conditions alone are not actionable. "The law intervenes only where the distress inflicted is so severe that no reasonable man could be expected to endure it. The intensity and the duration of the distress are factors to be considered in determining its severity." Comment *j*. See, also Prosser, Law of Torts sec. 12, at 54 (4th ed. 1971).

■ Mere interrogation of the children is clearly not "extreme and outrageous" conduct in that sense. Questions, even if asked in the allegedly hostile environment portrayed by the Complaint, are not such as "to go beyond all possible bounds of decency." Nor is the alleged conduct so severe that no reasonable child could be expected to endure it.

■ However, the nude search of Ashley falls on a different playing field. *Darryl H.*, 801 F.2d at 900 quotes *New Jersey v. T.L.O.*, 469 U.S. 325, 337–38, 105 S.Ct. 733, 740–41, 83 L.Ed.2d 720 (1985):

> A search of a child's person ... is undoubtedly a severe violation of subjective expectations of privacy.

And as the earlier opinion in *Doe v. Renfrow*, 631 F.2d 91, 92–93 (7th Cir.1980) (per curiam) put it, concluding with a quotation from *Wood v. Strickland*, 420 U.S. 308, 321, 95 S.Ct. 992, 1000, 43 L.Ed.2d 214 (1975):

> It does not require a constitutional scholar to conclude that a nude search of a thirteen-year-old child is an invasion of constitutional rights of some magnitude. More than that: it is a violation of any known principle of human decency. Apart from any constitutional readings and rulings, simple common sense would indicate that the conduct of the school officials in permitting such a nude search

was not only unlawful but outrageous under "settled indisputable principles of law." [25]

This is not of course an ultimate ruling on the merits. For now it is enough to say the nude examination of Ashley *may* give rise to a claim for intentional infliction of emotional distress against District. However, that incident relates solely to Ashley. No allegations sustain Lara's claim. Accordingly, Lara's claim for intentional infliction is dismissed, while Ashley's survives. [26]

### 3. Count V

■ Count V asserts a claim by Paul, Ashley and Lara for negligent malpractice. Specifically Count V ¶ 33 asserts nurse O'Boyle and psychologist Petersen violated the duties owed to plaintiffs.

But Ill.Rev.Stat. ch. 110, ¶ 2–622 (1988) ("Section 2–622") requires that plaintiffs in any action for "healing art malpractice" must attach to their complaint an affidavit declaring the case has been presented to a health care professional and plaintiffs have received a written report opining that a meritorious claim exists. [27] Failure to file a certificate provides grounds for dismissal (Section 2–622(g)), for the purpose of the statute "was to eliminate frivolous lawsuits at the pleadings stage" (*Lyon by Lyon v. Hasbro Industries, Inc.*, 156 Ill.App.3d 649, 655, 109 Ill.Dec. 41, 45–46, 509 N.E.2d 702, 706–07 (4th Dist.1987)).

Landstrom Mem. 1–8 and Mem. 2–17–18 argues:

1. O'Boyle "was acting beyond her function," and

2. "the lack of a 'malpractice' affidavit is not dispositive."

Plaintiffs' first argument is nonsensical and patently without merit. Because the second contention labels Section 2–622 as procedural and not substantive, it too must fail. *Erie* counsels application of the Illinois provision here. [28]

Count V is dismissed for plaintiffs' failure to comply with Section 2–622. In accordance with the recent directive in *McCastle v. Sheinkop*, 121 Ill.2d 188, 193–94, 117 Ill.Dec. 132, 135–36, 520 N.E.2d 293, 295–96 (1987), such dismissal is without prejudice as to District (the only defendant still in court). [29]

### 4. Count VI

Count VI asserts a claim for wilful-wanton conduct arising out of the Count VI malpractice claims. Because Count VI is derivative, it too must be dismissed.

■ In this instance, however, the dismissal is with prejudice rather than without. District is a "local public entity" as defined in the Tort Immunity Act, Ill.Rev. Stat. ch. 85, ¶ 1–206. Section 2–102 of the same Act prohibits the recovery of punitive damages from such an entity, while Section 2–213 of the Act insulates public employees to the same extent. Even were plaintiffs to reinstate Count V, then, they could not reassert Count VI.

### Conclusion

Plaintiffs have not and cannot overcome the individual defendants' rights to quali-

---

**25.** [Footnote by this Court] *Darryl H.*, 801 F.2d at 900 quoted and reaffirmed the first two sentences from *Doe*.

**26.** District Mem. 17 also argues Count IV fails to state a claim for negligent infliction of emotional distress. While no such claim is expressly stated in the Complaint, District is right. Any claim for negligent infliction of emotional distress would require physical injury or illness resulting from District's alleged negligence (*Rickey v. Chicago Transit Authority*, 98 Ill.2d 546, 555, 75 Ill.Dec. 211, 215, 457 N.E.2d 1, 5 (1983)). Count IV contains no such allegations.

**27.** Section 2–622(a)(1) also provides that if the affidavit is filed as to the actions of a psycholo-

gist (as here with Petersen), the written report must come from a health professional licensed in the same profession, and with the same class of license, as the psychologist.

**28.** This Court's colleague Judge Ann Williams has dealt with that issue persuasively in *Thompson by Thompson v. Kishwaukee Valley Medical Group*, No. 86 C 1483, avail. on LEXIS (N.D.Ill. Oct. 6, 1986) [available on WESTLAW, 1986 WL 11381] (holding plaintiff's failure to comply with Section 2–622 requires dismissal in federal court).

**29.** As to the individual defendants, their *UMW v. Gibbs* dismissal from all pendent claims is without prejudice in all events.

fied immunity. Both Section 1983 claims against those defendants are dismissed under Rule 12(b)(6). All pendent claims (Counts III through VI) against the individuals are also dismissed pursuant to *UMW v. Gibbs.*

Count I does state a claim for municipal liability against District, requiring denial of its motion to dismiss. Count II, however, fails to state a First Amendment claim. That Count is dismissed under Rule 12(b)(6). For the reasons already stated, Count IV also remains viable against District (and its motion to dismiss that Count is denied), while Counts V and VI are dismissed under Rule 12(b)(6).

District is ordered to answer surviving Counts I and IV on or before November 15, 1988. This action is then set for a status hearing at 9 a.m. November 21, 1988.

Plaintiffs have attempted to state a claim against the individuals through six complaints during the course of months of litigation. Enough is enough. On plaintiffs' own refined and expanded version of the facts, all the case law teaches that plaintiffs could never overcome the individuals' claims to qualified immunity on the Section 1983 claims. No additional leave to refile will be allowed.

Nor should the individual defendants, extricated from this lawsuit at long last, have to fear the dropping of another shoe. They are entitled to the certainty and finality of a Rule 54(b) determination. Accordingly, this Court expressly determines there is no just reason for delay and expressly directs the entry of final judgment in favor of the individual defendants and against plaintiffs (see *National Metalcrafters v. McNeil,* 784 F.2d 817, 821 (7th Cir.1986)).[30]

---

30. District's Mem. 16 says it is immune from civil liability under Tort Immunity Act ¶¶ 2–103, 2–107 and 2–109. In that respect, the only relevant provision appears to be Section 2–109, which exempts public entities from liability under a respondeat superior theory when the employee is not liable. That is really a simple codification of respondeat superior law. However, the immunity issue is not properly before this Court, for the individual defendants have been dismissed and no decision on the merits has been rendered. Consequently, this Court expresses no opinion on the issue.