Ashley **LANDSTROM** and Lara Landstrom, minors, by their mother and next friend Jane **JENSEN**, and Paul Landstrom and Jane Jensen, individually, Plaintiffs,

v.

**BARRINGTON SCHOOL DISTRICT 220, Defendant.**

**No. 87 C 3423.**

United States District Court, N.D. Illinois, E.D.

June 6, 1990.

---

Dennis E. Carlson, Chicago, Ill., for plaintiffs.

James O. Nolan, John M. Hynes, Clausen Miller Gorman Caffrey & Witous, P.C., Chicago, Ill., for defendant.

### MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Originally Ashley and Lara Landstrom ("Ashley" and "Lara"), two grammar

---

school students in Barrington School District 220 ("District"), and their parents Paul Landstrom ("Paul") and Jane Jensen (collectively "Landstroms") sued District, four of its employees, the Illinois Department of Children and Family Services ("DCFS")[1] and one of its employees, asserting:

1. violations of plaintiffs' constitutional rights in the course of a child abuse investigation (in this respect plaintiffs' claims are brought under 42 U.S.C. § 1983 ("Section 1983")); and

2. various pendent state-law claims.

This Court's October 31, 1988 memorandum opinion and order (the "Opinion," 699 F.Supp. 1270) dismissed all counts as to the individual defendants,[2] leaving District alone as a potential target.

As to the latter, the Opinion also dismissed a number of the counts advanced in the most recent recasting of plaintiffs' complaint (the "Complaint"), leaving open only two claims against District:

1. Count 1's Section 1983 claim and

2. Count 4's pendent state-law claim of intentional or reckless infliction of emotional distress.

District has now moved under Rule 56 for summary judgment on both those claims. For the reasons stated in this memorandum opinion and order, District's motion is granted as to Count 1 while Count 4 is dismissed without prejudice.

### FACTS [3]

District comprises one high school, a middle school and eight elementary schools and is governed by a seven-member Board of Education ("Board"). District's Superintendent Clyde Slocum ("Slocum") reports directly to Board. Principal Marie Plozay ("Plozay") of Hough Street School ("Hough"), attended by Ashley and Lara, reports to District's Associate Superintendent, who in turn reports to Slocum. Hough psychologist Lorenz Peterson ("Peterson") reports to Plozay as well as to District's Director of Special Services.

District's Administrative Council, made up of several District officials including its Superintendent and the principals of the various schools, bears responsibility for adopting administrative procedures necessary for the implementation of Board policies. In November 1981 Board adopted a written policy as to reporting suspected child abuse or neglect in accordance with the Abused and Neglected Child Reporting Act (Ill.Rev.Stat. ch. 23, ¶¶ 2051–2061.7).[4] And in June 1986 the Administrative Council adopted a procedure for the reporting of suspected child abuse:

School personnel having reasonable cause to believe that a child may be abused or neglected shall:

—inform their immediate supervisor;

—immediately report or cause a report to be made to the Department of Child and Family Services (DCFS);

—submit a written report of the abuse to the Director of Special Services and the Superintendent;

—cooperate with the investigation by DCFS.

By virtue of her position as Hough principal, Plozay was a member of the Adminis-

---

1. This Court's September 16, 1987 memorandum opinion and order dismissed the second of plaintiffs' numerous efforts to file a viable complaint (a tortuous process described in the Court of Appeals opinion cited at n. 2). At page 5 of the September 1987 slip opinion this Court dismissed out DCFS as a defendant because of the State's immunity from suit (a subject matter jurisdictional flaw).

2. Opinion at 1283 conferred finality on those dismissals by a Fed.R.Civ.P. ("Rule") 54(b) determination. That finality carried with it the appealability of the dismissal order, and our Court of Appeals has now affirmed it in all respects (892 F.2d 670 (7th Cir.1990)).

3. Familiar Rule 56 principles impose on the movant the burden of establishing the lack of a genuine issue of material fact (*Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986)). For that purpose this Court is called on to draw all "reasonable inferences, not every conceivable inference" in the light most favorable to the nonmovants—in this case the plaintiffs (*DeValk Lincoln Mercury, Inc. v. Ford Motor Co.*, 811 F.2d 326, 329 (7th Cir.1987)).

4. Appendix I reproduces that policy, which is published under reference number 720.08 in Board's Rules and Regulations.

trative Council that approved the just-quoted procedure, but she did not participate in its preparation. At no other time during their respective employments were Plozay or Peterson involved in the formulation of Board's written child abuse reporting policy.

On March 17, 1987 Ashley was a first grader and Lara was a second grader at Hough. On that day Ashley's teacher Margaret Gruber ("Gruber") notified Plozay that Ashley was complaining of a sore finger that she had injured by putting her hand behind her to protect herself from her father's spanking. At Plozay's suggestion Ashley saw Hough's health aide Mary O'Boyle ("O'Boyle") at the end of the day. O'Boyle saw that Ashley's finger was swollen and told her to tell her mother to put ice on the finger. That evening Gruber drove Ashley home—whether because Ashley accidentally missed the school bus or because she was intentionally detained by O'Boyle or Plozay is disputed by the parties, but in any ultimate sense it proves irrelevant to the resolution of the case.

On March 18, 1987 O'Boyle informed Plozay that Ashley's finger was now more swollen and that she might be in need of medical attention. O'Boyle also told Plozay that Ashley was complaining that she could not sit down as a result of the spanking. Plozay then observed Ashley's finger to be swollen, bruised and immobile and suggested to O'Boyle that she ask Ashley if she could see where it hurt. Following that suggestion O'Boyle asked a secretary to step into the health office and she then asked Ashley if she would like to show O'Boyle where it hurt. Ashley responded in the affirmative, lifted her skirt and pulled the waistband of her panties down to expose her right buttock. O'Boyle reported her findings to Plozay, who then went into the health office and herself asked Ashley if she would like to show Plozay where it hurt. Again answering in the affirmative, Ashley revealed her right buttock to Plozay, who observed a large yellow and purplish bruise and two round, dime-size abrasions in line with Ashley's spine. Plozay called Jensen and told her that Ashley's finger needed medical atten-

tion. She then reported the entire incident to DCFS.

On March 19, 1987 DCFS' David Harris ("Harris") came to Hough to interview the Landstrom girls. Because Ashley was absent Harris interviewed only Lara in the school health office, with O'Boyle, Gruber and Plozay present. Harris asked Lara if her father spanked Ashley and she responded that he did so frequently. Harris returned to the school the next day and had a similar interview with Ashley, who also reported that her father spanked her. No request for an examination or actual examination occurred at that time. Peterson was not present for either of these interviews.

District now moves for summary judgment on Count 1, urging (1) that the primary actors in this case were not the final policymakers as to the allegedly unconstitutional conduct at issue and (2) that municipal liability may therefore not attach. Because no evidence has been adduced that Plozay or Peterson or both were its final policymakers, District's motion is granted.

## PREREQUISITES OF DISTRICT'S LIABILITY

*Monell v. New York City Department of Social Services,* 436 U.S. 658, 690, 98 S.Ct. 2018, 2035–36, 56 L.Ed.2d 611 (1978) established that municipalities and other bodies of local government are "persons" within the meaning of Section 1983 and thus may be sued directly if alleged to have caused a constitutional tort through "a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." But *Monell, id.* at 691, 98 S.Ct. at 2036 explicitly rejected municipal liability bottomed only on a respondeat superior theory, stating "Congress did not intend municipalities to be held liable unless action pursuant to official municipal policy of some nature caused a constitutional tort."

*Pembaur v. City of Cincinnati,* 475 U.S. 469, 479–80, 106 S.Ct. 1292, 1298, 89 L.Ed.2d 452 (1986) (emphasis in original, footnote omitted) then further explicated

*Monell*'s teaching on the unavailability of respondeat superior liability:

> The "official policy" requirement was intended to distinguish acts of the *municipality* from acts of *employees* of the municipality, and thereby make clear that municipal liability is limited to action for which the municipality is actually responsible.

That focus on "official policy" does not necessarily require repetition of the violative conduct. Rather "it is plain that municipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances" (*id.* at 480, 106 S.Ct. at 1298).[5]

Because of the residual murkiness as to when single decisions reflect "official policy" (see n. 6), the Court again addressed the issue in *City of St. Louis v. Praprotnik*, 485 U.S. 112, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988). Justice O'Connor's plurality opinion in *Praprotnik*, *id.* at 123, 108 S.Ct. at 923–24 (emphasis in original) acknowledged that the divided *Pembaur* Court had failed to "settle on a general formulation" but said that *Pembaur* had laid out the following "guiding principles":

> First, a majority of the Court agreed that municipalities may be held liable under § 1983 only for acts for which the munic-

ipality itself is actually responsible, "that is, acts which the municipality has officially sanctioned or ordered." 475 U.S. at 480 [106 S.Ct. at 1298]. Second, only those municipal officials who have "final policymaking authority" may by their actions subject the government to § 1983 liability. *Id.* at 483 [106 S.Ct. at 1300] (plurality opinion). Third, whether a particular officer has "final policymaking authority" is a question of *state law*. *Ibid.* (plurality opinion). Fourth, the challenged action must have been taken pursuant to a policy adopted by the official or officials responsible under state law for making policy in *that area* of the city's business. *Id.*, at 482–83, and n. 12 [106 S.Ct. at 1299–1300 and n. 12] (plurality opinion).[6]

*Monell*, *Pembaur* and *Praprotnik* thus set the stage. Their principles must guide this Court in evaluating whether the facts of this case justify holding District liable for the actions of its individual representatives.

### PRINCIPAL AS FINAL POLICYMAKER?[7]

■ Landstroms urge that liability attaches to District because Plozay[8] was its

---

5. In a way the Court's use of "policy" (a term most frequently associated with a course of action) has itself been a source of trouble. When it is remembered that a municipality can act only through its individual employees or agents (by definition), while respondeat superior alone is insufficient to ground liability, it becomes plain that the necessary condition for Section 1983 responsibility is that the unconstitutional action must be traceable to the ultimate decisionmaker—either by his, her or their individual conduct or by someone else carrying out the decisionmaker's directive. Where the former is involved, that single act obviously binds the municipality; where the latter, there may be just a single act (one directly ordered by the ultimate decisionmaker), but more frequently the actor is carrying out a general policy set by the decisionmaker. In that last situation the terms "decisionmaker" and "policymaker" merge entirely.

6. [Footnote by this Court] Although that attempted synthesis did not command a Court majority (see concurring opinion by Justice Brennan, *id.* 485 U.S. at 132, 108 S.Ct. at 928–29, speaking for two other Justices), the analysis in

the balance of this opinion amply meets the standards suggested by the concurring opinion as well as by the four-Justice plurality opinion.

7. As to whether this inquiry is a fact question better left for jury determination, the plurality opinion in *Praprotnik*, 485 U.S. at 126, 108 S.Ct. at 925 said:

> [T]here can be no justification for giving a jury the discretion to determine which officials are high enough in the government that their actions can be said to represent a decision of the government itself.

That proposition was squarely rejected by the three concurring Justices (*id.* at 144, 108 S.Ct. at 934–35), so it did not command a Court majority. That makes no difference here, where there is clearly no genuine material factual issue to preclude a judgment in District's favor as a matter of law.

8. Originally the Complaint suggested that Peterson too was a final policymaker for District in this situation. However, plaintiffs' Reply Memorandum focuses exclusively on Plozay's status and completely abandons any attempt to link

final policymaker with respect to the school-initiated investigative detentions, interrogations and nude searches that allegedly violated plaintiffs' constitutional rights.[9] Their theory runs this way: In the absence of a written District policy regarding investigation of child abuse and in light of the fact this was the first District occurrence involving an attempt to investigate, Plozay as Hough's principal was clearly the senior policymaker at the school site and therefore had official responsibility for developing the final policy as to the specific situation. According to P.R. Mem. 4, that conclusion finds additional support because "[n]o retention of any authority to review such a decision appears in any rule or regulation relied on by defendant which would come into play before the contemplated action is a fact accomplished."

Several problems plague that theory. None requires extended discussion.

First, while Plozay as principal may be the senior *school* official involved, that does not make her the senior *District* policymaker in the area of child abuse detection and reporting. Because Landstroms seek to impose liability on District and not on Hough,[10] Plozay's role in the District hierarchy is the relevant inquiry. Landstroms point to nothing in District's rules or regulations that vests Plozay individually or school principals generally with any final policymaking authority in the area of child abuse detection and reporting. Landstroms seem to believe that common sense makes it obvious that Plozay would have such authority—but in fact it is inherently illogical to assume that District would allow each of its of *ten* principals independently to wield the power to make final

District policy in this sensitive area. It is equally untenable to assume that Plozay individually was vested with that authority by the mere fortuity of being the first principal to confront the situation. Simply put, Landstroms cannot rely on manipulation of the *facts* to establish Plozay's status as a final policymaker—rather they must look to state *law*.

On that score they can find no comfort. Ill.Rev.Stat. ch. 122, ¶ 10–20.5[11] charges Board alone with responsibility for creating District policy, directing Board:

> To adopt and enforce all necessary rules for the management and government of the public schools of their district.

Further, Section 10–21.4 requires Board:

> to employ a superintendent who shall have charge of the administration of the schools under the direction of the board of education.

In the specific area of child abuse, Section 10–23.12 obligates Board:

> To provide staff development for local school site personnel who work with pupils in grades kindergarten through 8, in the detection, reporting and prevention of child abuse and neglect.

As already stated in the "Facts" section of this opinion, Board did adopt an official policy on child abuse and neglect reporting in 1981, and by 1986 it had promulgated a detailed administrative procedure for school personnel who confront a suspected child abuse situation.

It is thus apparent that despite Landstroms' contrary protestations, there was indeed a District policy on the reporting of child abuse at the time of the complained-of incident. It is equally apparent that Plozay

---

Peterson to Board's policymaking hierarchy. Hence this opinion limits its analysis solely to Plozay's status.

**9.** This opinion need not decide whether and to what extent those actions arguably violated Ashley's, Lara's or Landstroms' constitutional rights, for the dispositive question whether the only remaining defendant (District) may be held liable for any such transgression today receives a negative answer.

**10.** Illinois law *does not treat* an *individual* school as a legal entity.

**11.** All further references to provisions of the Illinois School Code (Ill.Rev.Stat. ch. 122) will take the form "Section—." That usage comports with the Illinois General Assembly's use of that word and of the symbol "§" in its enactments, even though the publisher of the Smith–Hurd annotated version has chosen to shift to "¶" instead. And because of the totally different numbering system in the two statutes, there is no potential for confusion with this opinion's use of "Section 1983" to refer to the federal statute invoked by plaintiffs.

engaged in activity not sanctioned by that policy. Those two facts sound the death knell for Landstroms' case—they simply have not shown a "direct causal link between [the] municipal policy or custom, and the alleged constitutional deprivation" (*City of Canton v. Harris*, 489 U.S. 378, 109 S.Ct. 1197, 1203, 103 L.Ed.2d 412 (1989)).

Quite the contrary is true—what was done here involved precisely the type of *unauthorized* employee action that *cannot* render a municipality liable. As the plurality opinion in *Praprotnik*, 485 U.S. at 127, 108 S.Ct. at 925–26 specifically says:

> When an official's discretionary decisions are constrained by policies not of that official's making, those policies, rather than the subordinate's departures from them, are the act of the municipality.[12]

If an employee such as Plozay followed Board's policy and in the process violated an individual's rights, municipal liability would be appropriate. But where as here the employee's conduct is at odds with the official policy, the municipality may not be taken to task under Section 1983.

Landstroms attempt to counter by arguing that Section 10–21.4a specifically delegates Board's policymaking authority to the principals, thereby giving Plozay the power to formulate additional or contrary policy in the course of performing her duty. That statute reads:

> The principal shall assume administrative responsibilities and instructional leadership, under the supervision of the superintendent, and in accordance with reasonable rules and regulations of the board, for the planning, operation and evaluation of the educational program of the attendance area to which he or she is assigned.

Landstroms Mem. 2–3 distorts the statutory meaning by placing emphasis on the principal's assumption of "administrative responsibilities and instructional leadership ... for the ... *operation* ... *of the attendance area to which he or she is assigned.*" But one of the ellipses in that quotation suppresses four very important

words of limitation: Principals have the responsibility for "operation and evaluation *of the educational program* of the attendance area to which he or she is assigned." Thus Section 10–21.4a does delegate a certain amount of authority to the principals, but only in the well-defined area of educational and scholastic matters—*not* in a way that allows the principals to create general policy or to usurp such authority in an area for which Board is expressly made responsible by Section 10–23.12.

In sum, even if principals generally have policymaking authority in some respects, the fourth guiding principle enunciated in *Praprotnik*—that "the challenged action must have been taken pursuant to a policy adopted by the official or officials responsible under state law for making policy in *that area* of the [municipality's] business" —cannot be met. No municipal liability attaches to District under Section 1983.

### PENDENT STATE CLAIM

■ That leaves for consideration only the Count 4 claim, one advanced under Illinois law and asserting the intentional or reckless infliction of emotional distress on plaintiffs. That tort has been given a narrow reading (see, e.g., *Schroeder v. Lufthansa German Airlines*, 875 F.2d 613, 623–24 (7th Cir.1989), quoting *McGrath v. Fahey*, 126 Ill.2d 78, 86, 127 Ill.Dec. 724, 727, 533 N.E.2d 806, 809 (1988))—and of course it is not for federal courts to expand the frontiers of state law (see, e.g., *Gust K. Newberg Construction Co. v. E.H. Crump & Co.*, 818 F.2d 1363, 1368 (7th Cir.1987)). To give plaintiffs a full opportunity to persuade a court to fit their facts under the proposed rubric, the best course of action is to follow the teaching of *United Mine Workers v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966) (citations omitted):

> It has consistently been recognized that pendent jurisdiction is a doctrine of discretion, not of plaintiff's right. Its justification lies in considerations of judicial economy, convenience and fairness to liti-

---

**12.** [Footnote by this Court] Nothing in the con-

curring opinion casts doubt on that proposition.

gants; if these are not present a federal court should hesitate to exercise jurisdiction over state claims, even though bound to apply state law to them. Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footer reading of applicable law. Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well.

With no federal claim now surviving to serve as the source of its attachment, the Count 4 state tort claim is dismissed without prejudice.

## CONCLUSION

There are no genuine issues of material fact as to Count 1. And because under the uncontroverted facts the acts that gave rise to the constitutional violations alleged in that Count were not taken by the municipal policymaker, District is entitled to a judgment as a matter of law on Count 1. In light of that disposition, pendent Count 4 is dismissed without prejudice. This action is therefore dismissed in its entirety.

## APPENDIX I

Barrington Community Unit School District 220 720.08

## STUDENTS

STUDENT WELFARE—Child Abuse

According to Illinois law, a staff member who has reasonable cause to suspect that a student may be an abused or neglected child shall report such a case to the Department of Children and Family Services. In such a situation the staff member shall notify the Superintendent that a report has been made. Traditional considerations of confidentiality shall not constitute grounds for failure to report such cases.

Illinois law provides that a person who makes a report of suspected child abuse shall have immunity from any liability, either civil or criminal, that might result from the report.

Abuse and neglect are defined by Illinois law but may generally be understood as follows:

1.  Abuse is any physical or mental injury or sexual abuse inflicted on a child other than by accidental means by a person who is responsible for the child's health and welfare.

2.  Neglect is abandoning a child, subjecting a child to an environment injurious to his/her welfare, or failing to provide the proper support, education, or medical or remedial care required by law by one who is responsible for the child's welfare.

LEG.REF.: I.R.S. 23, 2051 et. seq.

ADOPTED: November 11, 1981