**Amanda L. OLIVER by her natural guardian Becky L. HINES, et al., Plaintiffs,**

v.

**Kevin McCLUNG, et al., Defendants.**

**Cause No. 1:94–CV–364.**

United States District Court,
N.D. Indiana,
Fort Wayne Division.

Dec. 20, 1995.

---

1210

Offer Korin, Frank C. Capozza, Katz and Korin PC, Indianapolis, IN, for plaintiffs.

Carla J. Baird, Hunt, Suedhoff, Borror & Eilbacher, Fort Wayne, IN, David R. Day, Johnson, Smith, Pence, Densborn, Wright & Heath, Indianapolis, IN, for defendants.

### MEMORANDUM OF DECISION AND ORDER
WILLIAM C. LEE, District Judge.

### I. INTRODUCTION

This matter is before the Court on cross-motions for summary judgment. Defendants filed their Motion for Summary Judgment on October 2, 1995. Plaintiffs filed their Motion for Summary Judgment on October 20, 1995, in conjunction with Plaintiffs' Brief in Opposition to Defendants' Motion for Summary Judgment. Defendants filed a reply Brief in Support of Defendants' Motion for Summary Judgment and Answer Brief in Opposition to Plaintiffs' Motion for Summary Judgment on November 6, 1995. Finally, Plaintiffs filed their Reply to Defendants' Answer Brief on November 17, 1995. For the following reasons, Defendants' Motion for Summary Judgment is GRANTED in part and DENIED in part; Plaintiffs' Motion for Summary Judgment is DENIED.

### II. STATEMENT OF FACTS

Virtually all of the underlying facts of this case are undisputed. At the time of the incident which is the subject of this lawsuit, the Plaintiffs, Amanda L. Oliver ("Oliver"), Angela J. Wright ("Wright"), Andrea D. Roach ("Roach"), April L. Rogers ("Rogers"), Summer Stanton ("Stanton"), and Maria Sargent ("Sargent") (also referred to collectively as "Plaintiffs") were seventh grade students attending West Jay County Junior High School ("West Jay"), an Indiana public school operated by the Jay County School Corporation ("Jay County"). Plaintiffs named as Defendants the Board of Trustees for the Jay County School Corporation ("School Board") and George Gilbert ("Gilbert"), Superintendent, in their official capacities. In addition, Plaintiffs named as Defendants Kevin McClung ("McClung"), principal at West Jay, Robert Prescott ("Prescott"), a teacher at West Jay, Janice Miller ("Miller"), also a teacher at West Jay, and Diana Stewart ("Stewart"), a substitute food service worker at West Jay. (Plaintiffs subsequently agreed to dismiss Prescott from the suit.)

The Plaintiffs allege that they were the victims of an illegal search performed by McClung, Miller and Stewart on March 4, 1994. Plaintiffs assert a claim based on a violation of their constitutional rights, as well as several state law claims.

The facts reveal that on March 4, 1994, immediately following their physical edu-

cation class, two female students reported to their gym teacher, Prescott, that four dollars and fifty cents ($4.50) was missing from the locker room. Prescott informed McClung of the girls' allegation of possible theft. McClung decided to conduct a search of the students and their lockers. He asked Miller and Stewart to assist him in the search. McClung then told all the girls in the gym class to remain in the gym. He then directed girls to go into the locker room in pairs. Once inside, McClung, Miller and Stewart searched the girls' lockers and book bags. They also instructed the girls to remove their shoes and socks in an effort to uncover the missing loot.

Stewart then suggested that the girls could hide the money in their bras, and asked McClung if he wanted the girls' bras searched. McClung decided to conduct such a search and ordered Miller and Stewart to take the girls to another part of the locker room to do so. All of the "strip searches" were conducted in a similar fashion, although the specific details of each one vary somewhat. Rogers, for example, was forced to remove her bra, which she did from underneath her shirt, and hand it to Stewart for examination. Rogers Deposition, pp. 19–20. Roach was told by Stewart to remove her shirt and bra, which she did, so they could be inspected. Stewart then patted Roach's pockets on the outside of her pants, and placed her hands inside the girl's pockets. Roach Deposition, pp. 22–23. Oliver went into the locker room and removed her pants and shirt and handed them to Stewart for inspection. She was then told to loosen the straps of her bra to see if any money fell out. Oliver Deposition, pp. 22–23. Wright was told by Stewart to shake her bra to see if any money fell out. Stewart also patted Wright's pockets. Wright Deposition, pp. 21–22. Sargent was told to take off her shirt by either Stewart or Miller, who then checked Sargent's bra by lifting it up. Sargent was then told to unbutton her pants and either Miller or Stewart checked the waistline of Sargent's pants by sticking a thumb in the waistline and going around the waist. Sargent Deposition, pp. 24–25. Stanton was also told to remove her shirt and pull the straps of her bra off her shoulders. Stanton Deposition,

pp. 46–47. Once the girls were searched they were permitted to leave the gym and go on to their next class.

At some point later that same day, McClung concluded that the search had been a mistake. He spent that evening and the rest of the weekend contacting the parents of all the students who were subjected to the search in order to report what had taken place. On the following Monday morning, McClung met with the girls and apologized to them.

The plaintiffs allege that this search was unreasonable and therefore a violation of their Fourth Amendment right. They claim that they were embarrassed, humiliated, and in some cases traumatized by the event. Three of the girls originally filed suit, asserting a claim pursuant to 42 U.S.C. § 1983. The complaint was later amended to add three additional plaintiffs.

### III. SUMMARY JUDGMENT STANDARD

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). However, Rule 56(c) is not a requirement that the moving party negate his opponent's claim. *Fitzpatrick v. Catholic Bishop of Chicago*, 916 F.2d 1254, 1256 (7th Cir. 1990). Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery, against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and in which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). The standard for granting summary judgment mirrors the directed verdict standard under Rule 50(a), which requires the court to grant a directed verdict where there can be but one reasonable conclusion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). A scintilla of evidence in

support of the non-moving party's position is not sufficient to successfully oppose summary judgment; "there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* at 251, 106 S.Ct. at 2512; *In Re Matter of Wildman,* 859 F.2d 553, 557 (7th Cir.1988); *Klein v. Ryan,* 847 F.2d 368, 374 (7th Cir.1988); *Valentine v. Joliet Township High Sch. Dist. No. 204,* 802 F.2d 981, 986 (7th Cir.1986). No genuine issue for trial exists "where the record as a whole could not lead a rational trier of fact to find for the nonmoving party." *Juarez v. Ameritech Mobile Communications, Inc.,* 957 F.2d 317, 322 (7th Cir.1992) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986)).

 Initially, Rule 56 requires the moving party to inform the court of the basis for the motion, and to identify those portions of the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which demonstrate the absence of a genuine issue of material fact." *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2553. The non-moving party may oppose the motion with any of the evidentiary materials listed in Rule 56(c), but reliance on the pleadings alone is not sufficient to withstand summary judgment. *Goka v. Bobbitt,* 862 F.2d 646, 649 (7th Cir.1988); *Guenin v. Sendra Corp.,* 700 F.Supp. 973, 974 (N.D.Ind.1988); *Posey v. Skyline Corp.,* 702 F.2d 102, 105 (7th Cir.), *cert. denied,* 464 U.S. 960, 104 S.Ct. 392, 78 L.Ed.2d 336 (1983). In ruling on a summary judgment motion the court accepts as true the non-moving party's evidence, draws all legitimate inferences in favor of the non-moving party, and does not weigh the evidence or the credibility of witnesses. *Anderson,* 477 U.S. at 249–251, 106 S.Ct. at 2511. However, "[i]t is a gratuitous cruelty to parties and their witnesses to put them through the emotional ordeal of a trial when the outcome is foreordained" and in such cases summary judgment is appropriate. *Mason v. Continental Illinois Nat'l Bank,* 704 F.2d 361, 367 (7th Cir.1983).

 Substantive law determines which facts are material; that is, which facts might affect the outcome of the suit under the

governing law. *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. Irrelevant or unnecessary facts do not preclude summary judgment even when they are in dispute. *Id.* The issue of fact must be genuine. Fed.R.Civ.P. 56(c), (e). To establish a genuine issue of fact, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita,* 475 U.S. at 586, 106 S.Ct. at 1356; *First Nat'l Bank of Cicero v. Lewco Sec. Corp.,* 860 F.2d 1407, 1411 (7th Cir. 1988). The non-moving party must come forward with specific facts showing that there is a genuine issue for trial. *Id.* A summary judgment determination is essentially an inquiry as to "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson,* 477 U.S. at 251–252, 106 S.Ct. at 2512.

### IV. DISCUSSION

#### 1. Liability of the School Board and Gilbert

 The Plaintiffs have asserted a claim under 42 U.S.C. § 1983 against the School Board and Superintendent Gilbert, in their official capacities only, for an alleged violation of their constitutional rights arising from the search. According to *Monell v. Department of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), "a municipality cannot be held liable *solely* because it employs a tort-feasor—or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Monell,* 436 U.S. at 691, 98 S.Ct. at 2036 (italics in original). Furthermore, the Supreme Court stated that for purposes of applying § 1983, there is no basis for distinguishing between school boards and municipalities, since "each is an instrumentality of state administration." *Id.* at 696, 98 S.Ct. at 2038.

 However, this is not to say that the School Board cannot be held liable for violations of § 1983 under any circumstances. On the contrary, municipalities can be sued under § 1983 "when execution of a govern-

ment's policy or custom, whether enacted by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury...." *Id.* at 694, 98 S.Ct. at 2037. Therefore, for Plaintiffs to prevail against the School Board and Gilbert, they must establish one of the following: 1) there existed within the Jay County school system an express policy that when enforced caused a constitutional deprivation; or 2) there existed within the Jay County school system a practice or custom of such unconstitutional conduct; or 3) the constitutional injury was caused by a person with final policy making authority. *See McTigue v. City of Chicago,* 60 F.3d 381, 382 (7th Cir.1995); *Cornfield v. Consolidated High School District No. 230,* 991 F.2d 1316, 1324 (7th Cir. 1993).

■ Plaintiffs do not allege that the Jay County school system had an express policy in place which when executed caused the constitutional violations complained of. Rather, they claim that the facts indicate that there existed a "custom" or "practice" of such unconstitutional searches, or, in the alternative, that McClung constituted a person with final policy making authority.

As the Supreme Court wrote in *Monell:*

"... although the touchstone of the § 1983 action against a government body is an allegation that official policy is responsible for a deprivation of rights protected by the Constitution, local governments, like every other § 1983 'person,' by the very terms of the statute, may be sued for constitutional deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decision making channels. As Mr. Justice Harlan, writing for the Court, said in *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 167–168, 90 S.Ct. 1598, 1613[, 26 L.Ed.2d 142] (1970): 'Congress included customs and usages [in § 1983]

because of the persistent and widespread discriminatory practices of state officials.... Although not authorized by written law, such practices of state officials could well be so permanent and well settled as to constitute a 'custom or usage' with the force of law.'" 436 U.S. at 690–691, 98 S.Ct. at 2035–2036.

■ In addition, "... plaintiffs cannot claim municipal liability unless they can demonstrate that the enforcement of its policy was the 'moving force' behind the constitutional violation." *Cornfield v. Consolidated High School District No. 230,* 991 F.2d 1316, 1324 (7th Cir.1993) (citing *Oklahoma City v. Tuttle,* 471 U.S. 808, 823, 105 S.Ct. 2427, 2436, 85 L.Ed.2d 791 (1985)). The Supreme Court in *Oklahoma City* wrote that "[a]t the very least, there must be an affirmative link between the policy and the particular constitutional violation alleged." *Id.*

■ In an attempt to establish that there existed a "custom" within the Jay County schools of illegal searches, Plaintiffs rely on McClung's testimony that he had ordered a similar search of the boys' locker room three or four weeks prior to the search of the Plaintiffs. Plaintiffs' Memorandum in Support of Motion for Summary Judgment, p. 9; McClung Deposition, p. 76. Plaintiffs also point to the testimony of Miller, who stated that she had helped search the person of a male student at the East Jay County Junior High School.[1] *Id.* However, during the search of the boys' locker room, which also was an attempt to recover some missing money, the boys involved were not required to remove any articles of clothing other than their shoes and socks. McClung Deposition, p. 76. Miller's participation in the search of the male student at another school apparently occurred long before the incident complained of in this suit. In that search, which was intended to seize "snuff" or smokeless tobacco from the student, the boy was re-

1. Plaintiffs also allege that each search of each girl constituted a separate incident. Coupled with the search of the boys' locker room a month or so previously, Plaintiffs argue that this amounted to "between thirty and forty ... illegal body searches in less than four weeks." However, Plaintiffs cite no authority holding that in the case of a search of a group of students, each

individual search constituted a separate incident for purposes of establishing custom or practice. The Court is not willing to accept Plaintiffs' strained definition of "incident" in this context. Furthermore, McClung's testimony presents no evidence that the search of the boys was in fact an illegal search. McClung Deposition, p. 76.

quired to remove his shoes and socks and turn his pants pockets inside out. He was not required to remove any other articles of clothing. Miller Deposition, p. 34–35.

■ A single act generally is insufficient to establish the existence of governmental policy or custom. *Oklahoma City v. Tuttle,* 471 U.S. 808, 105 S.Ct. 2427, 85 L.Ed.2d 791, *reh'g denied,* 473 U.S. 925, 106 S.Ct. 16, 87 L.Ed.2d 695 (1985). The "single incident" rule serves principally to distinguish between policy and *isolated acts that do not amount to policy. Ross v. United States,* 910 F.2d 1422 (7th Cir.1990) (italics added). In the *Cornfield* case, the plaintiff sought to impose liability on a school district based on "one alleged previous strip search . . . as well as a subsequent endorsement by [the] school board president of strip searches of students conducted with parental consent." 991 F.2d at 1326. The Seventh Circuit rejected plaintiff's argument, stating that "We have held that an allegation of a *pattern or a series of incidents* of unconstitutional conduct is required to withstand a motion to dismiss. . . ." *Id.* (italics added) (citing *Powe v. City of Chicago,* 664 F.2d 639, 650 (7th Cir.1981)). The Plaintiffs have failed to present evidence of such a "pattern or . . . series of incidents" sufficient to impose liability on the School Board under the so-called "custom or practice" theory. Instead, they point to only two prior searches, neither of which was nearly as intrusive as the one at issue in this case. In fact, the deposition testimony presented by McClung and Miller regarding the two prior searches in Jay County schools fails to indicate that they were in fact illegal.

■ As stated earlier, Plaintiffs also claim that liability attaches to the School Board and Gilbert because Principal McClung was an individual with final policymaking authority. If the individual alleged to have carried out the unconstitutional search was a "policymaker" for the governmental entity, then even a single act is sufficient to demonstrate "policy," and liability may attach. *Pembaur v. Cincinnati,* 475 U.S. 469, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986). Whether an actor is a policymaker is

a question of state law. *Jett v. Dallas Independent School District,* 491 U.S. 701, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989); *City of St. Louis v. Praprotnik,* 485 U.S. 112, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988).

■ In support of their contention that McClung was a policymaker for the School Board, Plaintiffs cite the Court to I.C. § 20–8.1–5–2(b), which states:

> (b) Subject to the limitations in section 3 of this chapter, *each principal may take any action concerning his school or any school activity within his jurisdiction which is reasonably necessary to carry out or prevent interference with an educational function or school purposes.* Such action may include establishing written rules and standards to govern student conduct. West's Annotated Indiana Code (1995) (italics added).[2]

Plaintiffs did not cite subsection (f), which states:

> (f) The superintendent of schools within the entire school corporation, *and the principal within each school, are authorized to adopt formal policies establishing lines of responsibility and related guidelines and regulations. Id.* (italics added).

Plaintiffs contend that the rather broad language of I.C. § 20–8.1–5–2 should be interpreted to mean that a principal is a policymaker and, subsequently, McClung's decision to conduct the strip search in question was an act that could therefore be imputed to the School Board and Gilbert. Defendants counter by citing I.C. § 20–8.1–5–3, which states in relevant part:

> (b) All rules, standards or *policies adopted by anyone other than the governing body* and applying to any group of students or to students generally, *shall not be effective until they are reviewed and approved by the superintendent and until they shall be presented to the governing body.* The governing body may change any such rule, standard or policy in accordance with procedures which it may from time to time adopt. *Id.* (italics added).

---

2. I.C. § 20–8.1–5–2 and 20–8.1–5–3 were subsequently repealed, but the sections were in effect

at the time of the incident that is the basis of this lawsuit.

On the one hand, the provisions of § 20–8.1–5–2 seem to grant much authority to a school principal, at least in terms of decision-making authority within his own school. However, the provisions of § 20–8.1–5–3 place clear restrictions on that authority, and seem clearly to make the governing body (in this case the School Board) the true policymaker for the school corporation.

In addition, I.C. § 20–5–2–2 states in relevant part:

> In carrying out the school purposes of each school corporation, its governing body acting on its behalf shall have the following specific powers:
>
> (17) To prepare, make, enforce, amend, or repeal rules, regulations, and procedures for the government and management of the schools, property, facilities, and activities of the school corporation, its agents, employees, and pupils and for the operation of its governing body. . . .

The Seventh Circuit has stated that "identifying those vested with the authority to make policy is no mean feat. The exercise of discretion by a particular official, standing alone, does not give rise to municipal liability. Municipal liability should attach only if the unconstitutional decision was 'a deliberate choice to follow a course of action' and if state or local law authorized the decision-maker 'responsible for establishing final government policy with respect to the subject matter in question.'" *Cornfield*, 991 F.2d at 1325 (7th Cir.1993) (quoting *Pembaur*, 475 U.S. at 483–84, 106 S.Ct. at 1300)). The Court also wrote in *Cornfield* that "hierarchy is not necessarily dispositive of the issue inasmuch as municipal liability may be predicated upon the act of even a low-level subordinate who has been delegated final authority in a limited area. . . ." *Id.* (citing *Pembaur*, 475 U.S. at 483, 106 S.Ct. at 1300).

Defendants cite several cases which they maintain stand for the proposition that school principals do not have final policy-making authority. Plaintiffs urge the Court not to consider these cases, since all are from other jurisdictions. It is true that the question of whether an official has final policy-making authority is clearly a question of state law. *Jett v. Dallas Independent School District,*

491 U.S. 701, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989); *City of St. Louis v. Praprotnik,* 485 U.S. 112, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988). However, while the Court does not base its conclusion on these cases, a few of them are instructional and aid in explaining this Court's reasoning.

In *Eugene v. Alief Independent School District,* 65 F.3d 1299 (5th Cir.1995), the court held that, despite the fact that the Texas Education Agency employed a "site-based management philosophy" with regard to its individual school campuses, that did not mean that the principal of each school had final decision-making authority. 65 F.3d at 1305. Furthermore, the Fifth Circuit wrote, even if a principal had decision-making authority in a specific area, that did not mean that the principal had final policy-making authority if he or she was subject to guidelines or policies established by the school district. *Id.* at 1304.

The Eleventh Circuit held in *Jantz v. Muci,* 976 F.2d 623 (10th Cir.1992) that "delegation must be absolute to give rise to final authority. If the [school] board retains the authority to review, even though it may not exercise such review or investigate the basis of the decision, delegation of final authority does not occur." 976 F.2d at 631 (citing *Praprotnik,* 485 U.S. 112, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988)). The *Jantz* case also cites the case of *Williams v. Butler,* 863 F.2d 1398, 1402 (8th Cir.1988), wherein the court held that "[a] clear message from *Praprotnik* is that an incomplete delegation of authority—i.e., the right of review is retained—will not result in municipal liability, whereas an absolute delegation of authority may result in liability on the part of the municipality."

In the case of *Landstrom v. Barrington School District 220,* 739 F.Supp. 441 (N.D.Ill. 1990), the district court addressed the issue of the scope of a principal's authority in light of statutory language similar to the language found in I.C. § 20–8.1–5–2. In *Landstrom,* the court wrote that "[p]rincipals have the responsibility for 'operation and evaluation *of the educational program*' of the attendance area to which he or she is assigned." 739 F.Supp. at 446 (italics in original) (quoting the relevant portion of the Illinois Revised

Statutes). The court held that this "section ... does delegate a certain amount of authority to the principals, but only in the well-defined area of educational and scholastic matters—*not* in a way that allows the principals to create general policy or to usurp such authority in an area for which the Board is expressly made responsible...." *Id.* (italics in original).

Thus, while the provisions of I.C. § 20–8.1–5–2 seem to grant principals much discretion and authority in the operation of their schools, there are limitations placed on that authority. Specifically, § 20–8.1–5–3(b) expressly states that any "rules, standards or policies" that may be adopted by a principal do not become effective "until they are reviewed and approved by the superintendent and until they shall be presented to the governing body." Thus, it would appear that while McClung and other principals in Indiana were delegated much authority by I.C. § 20–8.1–5–2, that delegation was not absolute so as to grant principals the power to make final policy for the school boards.

The Court also notes that the language in § 20–8.1–5–2(b) permits a principal to "take any action concerning his school ... which is reasonably related to carry out or prevent interference with *an educational function or school purposes.*" (Italics added.) This is similar to the situation in *Landstrom,* in which the court held that language granting a principal broad discretion regarding educational and scholastic matters within his or her school did not equate to final policy-making authority. Likewise, while McClung may have had broad discretion to make decisions regarding the operation of the West Jay County Junior High School, nothing in § 20–8.1–5–2 purports to grant him policy-making authority. As stated above, such final policy-making authority appears to be impliedly, if not expressly, granted to the governing body of each school corporation by I.C. §§ 20–5–2–2 and 20–8.1–5–3.

Clearly, school principals in Indiana have a great deal of authority to make decisions in the best interest of their particular school. This is as it should be. To hold that principals and teachers cannot act promptly and unilaterally on issues such as discipline, scheduling and other administrative matters affecting their school would cripple a school's ability to provide efficiently for the education as well as the physical well-being of its student body. However, the provisions of I.C. § 20–8.1–5–3(b) indicate that, notwithstanding the broad powers granted to school principals, those principals are not responsible for establishing *final* government policy. "Municipal liability attaches only where the decision-maker possesses final authority to establish municipal policy...." *Pembaur,* 475 U.S. at 481, 106 S.Ct. at 1299 (1986). Final policymaking power in this instance lies with the governing body, the Jay County School Board. Accordingly, Defendants' Motion for Summary Judgment on the issue of the liability of the School Board and Gilbert is granted.

### 2. Qualified Immunity of McClung, Miller and Stewart

Defendants McClung, Miller and Stewart claim they are entitled to the protection of the doctrine of qualified immunity. The qualified immunity doctrine states that government officials performing discretionary functions are immune from suit for damages under § 1983 if their conduct did not violate clearly established rights of which a reasonable official would have known at the time of the conduct. *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Qualified immunity is an immunity from suit, and not just a defense to liability. *Mitchell v. Forsyth,* 472 U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985). Furthermore, the issue of whether qualified immunity attaches is a question of law for the Court to decide. *Hughes v. Meyer,* 880 F.2d 967 (7th Cir.1989) *cert. denied,* 495 U.S. 931, 110 S.Ct. 2172, 109 L.Ed.2d 501 (1990). "A qualified immunity analysis entails a purely objective inquiry to determine whether, at the time of the alleged illegal act, the right asserted by the plaintiff was clearly established in the particular factual context presented." *Polenz v. Parrott,* 883 F.2d 551, 553 (7th Cir. 1989). Finally, "the law in this circuit has been well settled that the plaintiff bears the burden of proving a clearly established right." *Hannon v. Turnage,* 892 F.2d 653

(7th Cir.), *cert. denied,* 498 U.S. 821, 111 S.Ct. 69, 112 L.Ed.2d 43 (1990). It is the responsibility of the Court "to determine whether at the time the alleged actions took place there was a substantial consensus of opinion that a course of conduct infringed on a right protected by the Constitution." *Doe v. Bobbitt,* 881 F.2d 510, 511 (7th Cir.1989) *cert. denied,* 495 U.S. 956, 110 S.Ct. 2560, 109 L.Ed.2d 742 (1990).

■■■■ It was established nearly eleven years ago that the Fourth Amendment's prohibition on unreasonable searches and seizures applies to searches conducted by school officials. *New Jersey v. T.L.O.,* 469 U.S. 325, 333, 105 S.Ct. 733, 738, 83 L.Ed.2d 720 (1985). The Supreme Court recognized the difficulty of balancing the rights of students with the need to maintain a safe and structured learning environment, writing that "[a]gainst the child's interest in privacy must be set the substantial interest of teachers and administrators in maintaining discipline in the classroom and on school grounds." *Id.* at 339, 105 S.Ct. at 741. Consequently, the Court held, "the legality of a search of a student should depend simply on the reasonableness, under all the circumstances, of the search." The Court held that a "twofold inquiry" must be made to determined whether a search is reasonable. First, the search must be "justified at its inception," and second, the search must be "reasonably related in scope to the circumstances which justified the interference in the first place." *Id.* at 341, 105 S.Ct. at 742 (quoting *Terry v. Ohio,* 392 U.S. 1, 20, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889 (1968)). The Court wrote further that "[s]uch a search will be permissible in its scope when the measures adopted are reasonably related to the objectives of the search *and not excessively intrusive in light of the age and sex of the student and the nature of the infraction.*" *Id.* at 342, 105 S.Ct. at 743 (italics added).

■■■ The Seventh Circuit addressed the issue of strip searches in *Doe v. Renfrow,* 631 F.2d 91 (7th Cir.1980). There, the Court specifically stated that "[i]t does not require a constitutional scholar to conclude that a nude search of a thirteen-year-old child is an invasion of some magnitude. More than

that: it is a violation of any known principle of human decency. Apart from any constitutional readings and rulings, simple common sense would indicate that the conduct of the school officials in permitting such a nude search was not only unlawful but outrageous under 'settled indisputable principles of law.'" 631 F.2d at 92–93 (quoting *Wood v. Strickland,* 420 U.S. 308, 321, 95 S.Ct. 992, 1000, 43 L.Ed.2d 214 (1975)). As Plaintiffs pointed out in their brief, that passage from the holding in *Doe v. Renfrow* was quoted by Justice Stevens in his separate opinion concurring in part and dissenting in part in *New Jersey v. T.L.O.* Justice Stevens also wrote that "[o]ne thing is clear under any standard—the shocking strip searches that are described in some cases have no place in the schoolhouse.... To the extent that deeply intrusive searches are ever reasonable outside the custodial context, it surely must only be to prevent imminent, and serious harm." 469 U.S. 325, 382, 105 S.Ct. 733, 764, n. 25, 83 L.Ed.2d 720.

Defendants cite several cases in which strip searches of students have been held to be legal. Defendants cite the *Cornfield* case, 991 F.2d 1316 (7th Cir.1993); *Widener v. Frye,* 809 F.Supp. 35 (S.D.Ohio 1992); and *Williams v. Ellington,* 936 F.2d 881 (6th Cir.1991). Defendants argue that the searches in those cases were similar to the search of Plaintiffs, and illustrate that the search of Plaintiffs was not unreasonable. The Court does not find Defendants' argument convincing. The cases are distinguishable from the case at bar. In *Cornfield,* school officials had strong reason to believe that the plaintiff was hiding drugs in the crotch of his pants. There had been recent incidents of drug-related activity reported by teachers and personal observations of bulges in the student's crotch area. He was taken into a locker room and told to remove his pants. However, he was allowed to put on his gym uniform during the search. Likewise, in *Widener,* school officials detected the odor of marijuana emanating from a male student, and observed him acting in a lethargic manner. The student, a fifteen-year-old male, was taken into a private office where, in the presence of two male security guards,

was told to remove his jeans but not his undergarments. The court held that the search was reasonable under the circumstances. In *Williams*, school officials again had very strong reason to believe that the female student was using drugs. The student was taken into a private office where, in the presence of a female secretary, she was told to remove her shirt, shoes and socks, and lower her jeans to her knees. Again, the court held that the search was reasonable. The court decided that under the particular circumstances of that case the standard of reasonableness set forth in *T.L.O.* was not breached.

While the cases cited by Defendants all involved strip searches, and those searches were held to be reasonable, it does not automatically follow that the search at issue in this case is also reasonable. The position taken by the Defendants ignores the plain language of the *T.L.O.* case, which held that "the legality of a search of a student should depend simply on the reasonableness, *under all the circumstances,* of the search." 469 U.S. at 341, 105 S.Ct. at 742 (italics added). In the present case, the Plaintiffs were in the seventh grade, making them all about thirteen years old at the time of the search. Perhaps even at that tender age, such a search might be argued to be reasonable if McClung, Miller and Stewart had evidence that certain of the girls were in possession of illegal drugs or weapons. It cannot be disputed that drugs and violence plague our nation's schools. Contraband such as drugs and weapons can constitute a threat of imminent harm to the students who possess them, to other students, and to teachers and other school personnel. However, that was simply not the situation in the present case.

In light of the case law as it existed at the time, especially the Supreme Court's decision in *T.L.O.* and the Seventh Circuit's decision in *Doe v. Renfrow,* the argument that it is not unreasonable to conduct a strip search of young school girls in an effort to recover the grand sum of four dollars and fifty cents is simply not convincing. As the Plaintiffs properly point out, *T.L.O.* was decided nearly eleven years ago, and *Renfrow* was decided some fifteen years ago. The mere fact that

Defendants can cite a few cases since then where strip searches have been held to be reasonable under certain circumstances does not change the facts of this case or the state of the law at the time this search was conducted. This Court finds that the Plaintiffs have met their burden of establishing that there was a "clearly established ... constitutional right of which a reasonable person would have known." In fact, McClung, by his own testimony, admitted that he felt the search had gone too far. He began calling the girl's parents the very day the search took place to explain what had happened, and he apologized to the girls the next school day. While McClung's subjective perception of what took place is irrelevant to qualified immunity analysis in light of *Harlow v. Fitzgerald, supra,* it is nonetheless revealing when making the determination of what "a reasonable person would have known" under these same circumstances.

Finally, with regard to the issue of qualified immunity, Defendants argue that Miller and Stewart, a teacher and a food service worker, respectively, "are not charged with the same level of knowledge concerning the constitutional rights of students that might apply to McClung" and so the two women should receive qualified immunity from suit. To support this argument, Defendants cite the single case of *Cales v. Howell Public Schools,* 635 F.Supp. 454 (E.D.Mich.1985). In *Cales,* the district court ruled that two defendants, one an assistant principal who conducted a strip search at the direction of another assistant principal, the other a school secretary who was ordered simply to observe the search, were entitled to qualified immunity. Defendants in the present case argue that Miller and Stewart are likewise immune from suit, presumably because they were simply following orders. Again, however, the case cited by Defendants is distinguishable from the present case. The *Cales* case was yet another drug case, and involved a strip search of a fifteen-year-old girl. The court held that the assistant principal was entitled to qualified immunity because "the search was not excessively intrusive given plaintiff's age (15) and the seriousness of the infraction." The court further held that since the assistant principal's "measures ... were rea-

sonably related to the objectives of the search," qualified immunity would attach. The court also granted immunity to the secretary, on the basis that she "merely observed" the search and did not participate. However, the court also stated that "if [the] defendant [who ordered it] was not justified in requesting the search, *both he and [assistant principal] are liable.*" 635 F.Supp. at 457 (italics added).

Both Miller and Stewart were school employees (albeit Stewart was only a substitute) at the time of the search. Defendants have presented the Court with no authority, aside from the case discussed above, that teachers or other school personnel should be held to a lesser standard than the official who actually orders an illegal search, for purposes of determining the issue of qualified immunity. Also, the evidence in this case suggests that both Miller and Stewart were actual participants in the search, not passive observers. Accordingly, Defendant's Motion for Summary Judgment on the issue of qualified immunity as to McClung, Miller and Stewart is denied.

## V. PLAINTIFFS' STATE LAW CLAIMS

### 1. False Imprisonment

 Plaintiffs attempt to state a cause of action for false imprisonment arising out of the strip search that took place in the girls' locker room.[3] Plaintiffs' Second Amended Complaint, p. 10. The tort of false imprisonment is defined as "the *unlawful* detention of a person against his or her will." *Lazarus Department Store v. Sutherlin,* 544 N.E.2d 513, 519 (Ind.App.1989) (citing *Delk v. Board of Commissioners of Delaware County,* 503 N.E.2d 436 (Ind.App.1987) (italics added)). Plaintiffs argue that they were the victims of false imprisonment when they were detained in the gym and locker room during the strip search. This argument misses the point. It was not the detention of the students that was unlawful, but rather, the strip search itself. As Defendants correctly point out, accepting the Plaintiffs' theory would mean that every "student escorted

to the office for investigation of a disciplinary matter would have a claim for false imprisonment if that student was ultimately exonerated from discipline." Defendants' Reply Brief, p. 11. Once McClung learned that some money may have been stolen from the girls' locker room, he, as principal, had every right to detain the girls while he investigated the matter. To hold otherwise would give rise to ludicrous results. For example, if a student is suspected of an infraction a teacher or principal has the right to order that student to stay after school as punishment, and it is probably quite safe to assume that such a detention would virtually always be against that student's will. According to Plaintiffs' theory, anytime it was subsequently discovered that the student who was detained was not the true culprit, that student would have a viable tort action against the school and school officials. Plaintiffs cite no authority that even remotely suggests that the tort of false imprisonment should be applied so broadly as to extend to the facts of this case. While it is necessary to go back over a century to locate case law directly on point, it does exist. In *Fertich v. Michener,* 11 N.E. 605, 111 Ind. 472, *reh'g denied,* 111 Ind. 472, 14 N.E. 68 (1887), the court held that "the detention or keeping in of pupils for a short time after dismissal of the class as punishment for some misconduct has none of the elements of false imprisonment about it, however mistaken a teacher may be as to the justice or propriety of imposing such a penalty at the particular time...." Accordingly, the Defendants are entitled to a grant of summary judgment in their favor on Plaintiffs' claim of false imprisonment.

### 2. "Sexual Battery," "Sexual Abuse," or Battery

 In their Complaint, Plaintiffs state a claim for "sexual battery" and "sexual abuse." Second Amended Complaint, p. 10. As Defendants correctly point out, there is simply no recognized tort action in Indiana for sexual battery or sexual abuse. While there is an Indiana criminal statute defining

---

**3.** In their Complaint, Plaintiffs alleged a state law claim for "confinement" or "unlawful imprisonment." The Court interprets this to be an assertion of a claim for the recognized tort of false imprisonment. Defendants also made this assumption and argued this point accordingly.

the crime of sexual battery, it clearly does not apply to the facts of this case.[4] Defendants also argue that Plaintiffs are attempting to amend their Complaint through their brief by alleging a battery in their Motion for Summary Judgment when their Complaint itself alleged a "sexual battery." While plaintiffs' allegation of battery may have been improperly or inartfully phrased, the mere fact that they termed this claim "sexual battery" in their Complaint and "battery" in their brief does not amount to an amendment of the Complaint. Rather, Plaintiffs have more carefully defined and argued their battery claim in their brief. Such edification of claims and issues is the whole purpose of the briefing process.

In Indiana, the tort of battery is defined as "[a] harmful or offensive contact with a person, resulting from an act intended to cause the plaintiff or a third person to suffer such a contact, or apprehension that such a contact is imminent...." *West v. LTV Steel Co.*, 839 F.Supp. 559, 562 (N.D.Ind.1993) (quoting *Fields v. Cummins Employees Federal Credit Union*, 540 N.E.2d 631, 640 (Ind.App.1989)). In *Fields*, a male supervisor was accused of touching the plaintiff on her back, buttocks and shoulders (among other offenses which gave rise to plaintiff's suit for sexual harassment). It was held that allegations of those unwelcome touches stated a claim for battery. The Plaintiffs in the present case do not allege such reprehensible behavior on the part of the Defendants. However, it has been long established in Indiana that "any touching, however slight, may constitute assault and battery." *Cohen v. Peoples*, 140 Ind.App. 353, 220 N.E.2d 665 (1966).

In the present case, at least three of the Plaintiffs testified that they were touched by Stewart and/or Miller during the strip search. Roach Deposition, p. 22; Wright Deposition, p. 21; Sargent Deposition, p. 24. Therefore, the Court finds that Plaintiffs have presented a fact issue on the claim of battery, and that Defendants' Motion for Summary Judgment on that issue is denied.

### 3. Negligent and Intentional Infliction of Emotional Distress

Plaintiffs have asserted claims for negligent and intentional infliction of emotional distress. The Defendants argue that the Plaintiffs' claim for emotional damages is barred by the so-called "impact rule." "As articulated by Indiana courts, the impact rule provides that 'damages for emotional distress are recoverable only when accompanied by and resulting from physical injury.'" *Pieters v. B–Right Trucking, Inc.*, 669 F.Supp. 1463, 1467 (N.D.Ind.1987) (quoting *Little v. Williamson*, 441 N.E.2d 974, 975 (Ind.App. 1982)). The impact rule has survived in Indiana due to the concern of the courts, more so in years past, that such claims would lead to a flood of litigation and that many of the claims would be fraudulent. *Shuamber v. Henderson*, 579 N.E.2d 452, 455 (Ind. 1991).

However, the Indiana Supreme Court has turned a very suspect eye on the impact rule in recent years, although it has yet to abandon the rule altogether. The court has carved out exceptions to the rule which restrict its application. The two leading cases dealing with this issue are *Shuamber* and *Cullison v. Medley*, 570 N.E.2d 27 (Ind.1991). In *Shuamber*, the Indiana Supreme Court, after discussing the policy reasons behind the impact rule, held that "[w]e are satisfied that these policy reasons are no longer valid concerns in the context of negligent infliction of emotional distress, and we perceive no reason under appropriate circumstances to refrain from extending recovery for emotional distress to instances where the distress is the result of a physical injury negligently inflicted on another." 579 N.E.2d at 455. Based on that reasoning, the court allowed plaintiff to recover damages for emotional distress that resulted from her witnessing the death of her son in an auto accident in which both were involved. In fact, this Court arrived at

---

**4.** I.C. 35–42–4–8 defines sexual battery as a crime occurring when "a person who, with intent to arouse or satisfy the person's own sexual desires or the sexual desires of another person touches another person when that person is: (1) compelled to submit to the touching by force or the imminent threat of force...." There is clearly no evidence that such conduct occurred during the search which is in issue in this case.

the same conclusion several years earlier in the *Pieters* case, wherein the plaintiff was permitted to recover damages for emotional distress after witnessing the death of her fiance in an accident in which they were both involved. In both cases, then, plaintiffs were permitted to recover damages for emotional distress that were *not* the result of physical injury to themselves.

In *Cullison,* the Indiana Supreme Court also seriously questioned the continuing validity the impact rule. Again, after addressing the policy reasons behind the rule, the court wrote: "We now conclude that the rationale for this rule, whatever its historical foundation, is no longer valid and, therefore, the so-called 'impact rule' does not apply to prohibit recovery for emotional distress when sustained in the course of a tortious trespass. When one invades the premises of another in such a way as to provoke a reasonably foreseeable emotional disturbance or trauma of the rightful occupier, the occupier ... may recover damages for such emotional injury." 570 N.E.2d at 30. This is the same reasoning employed by this Court in the case of *Moffett v. Gene B. Glick Co., Inc.,* 621 F.Supp. 244 (N.D.Ind.1985).[5] In *Moffett,* this Court wrote:

An exception to the impact rule exists. It arises when there are:

certain tort actions involving the invasion of a legal right which by its very nature is likely to provoke an emotional disturbance. False imprisonment and assault actions are examples of instances in which a disagreeable emotional experience would normally be expected to be inextricably intertwined with the nature of the deliberate wrong committed, thereby lending credence to a claim for mental disturbance. The conduct of the defendant in such circumstances is characterized as being willful, callous or malicious, which may produce a variety of reactions such as fright, shock, humiliation, insult, vexation, inconvenience, worry, or apprehension.

*Moffett,* 621 F.Supp. at 284 (citing *Charlie Stuart Oldsmobile, Inc. v. Smith,* 171 Ind. App. 315, 357 N.E.2d 247, 253 (1976), modified on other grounds, 175 Ind.App. 1, 369 N.E.2d 947 (1977)). Consequently, "no impact need be shown if (1) there is a tort which invades a legal right of the plaintiff; (2) which is likely to provoke an emotional disturbance or trauma; and (3) the defendant's conduct is willful, callous, or malicious." *Id.* at 284–285. Furthermore, "Indiana has long recognized a claim for emotional distress when accompanied by an assault or battery." *Fields v. Cummins Employees Federal Credit Union,* 540 N.E.2d 631, 640 (Ind.App.1989) (citing *Kline v. Kline,* 158 Ind. 602, 64 N.E. 9 (1902) and *Golibart v. Sullivan,* 30 Ind.App. 428, 66 N.E. 188 (1903)).

In the present case, the elements outlined in *Moffett* are met. The tort was battery, which one could reasonably believe would be likely to provoke an emotional response, especially under the circumstances of this case, and the defendants clearly acted willfully when they touched the plaintiffs. Consequently, Defendants' Motion for Summary Judgment on Plaintiffs' claim for negligent infliction of emotional distress is denied.

As to Plaintiffs' claim of intentional infliction of emotional distress, the Indiana Supreme Court wrote that "[t]he definition of the tort of intentional infliction of emotional distress is that 'one who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress....'" Restatement (Second) of Torts § 46 (1965). It is the *intent to harm one emotionally that constitutes the basis for the tort* of an intentional infliction of emotional distress." *Cullison,* 570 N.E.2d at 31 (italics added). In *Cullison,* the court recognized that under the proper circumstances, a defendant will be liable for the intentional infliction of emotional distress. However, even though the defendants in that case had trespassed onto plaintiff's property,

---

**5.** This Court overruled that portion of *Moffett* which dealt with the plaintiff's retaliatory discharge claim under Title VII. See *Reeder–Baker v. Lincoln National Corp.,* 644 F.Supp. 983

(N.D.Ind.1986). However, the holding that the plaintiff could maintain common law tort claims, including a claim for emotional distress, was not overruled.

yelled angrily at him, and threatened him with a gun (knowing, plaintiff alleged, that he had a fear of guns), the court nevertheless upheld the entry of summary judgment in favor of defendants on that claim. The court held that there was no evidence that the defendants actually intended to inflict emotional distress on the plaintiff. Similarly, in *Miller v. May*, 656 N.E.2d 1198 (Ind.App. 1995), the plaintiff, a nursing home resident, alleged negligent and intentional infliction of emotional distress after a home employee misinformed a newspaper that plaintiff had died. The appellate court affirmed the trial court's entry of summary judgment in favor of the defendants as to plaintiff's claim of intentional infliction of emotional distress, reasoning that plaintiff had presented "no evidence that the funeral home had intended to inflict emotional distress" upon him. 656 N.E.2d at 1200. Plaintiff's allegation, the court reasoned, constituted nothing more than a " 'stand alone' claim of the intentional infliction of emotional distress." *Id.* This is the situation in the present case. Plaintiffs present no evidence whatsoever that the Defendants intended to cause emotional distress. In the absence of any evidence that McClung, Miller or Stewart actually intended to inflict emotional damage, Plaintiffs' claim for intentional infliction of emotional distress must fail, and Defendants' Motion for Summary Judgment on that issue is granted.

## VI. PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

As noted at the beginning of this Memorandum, Plaintiffs filed a Motion for Summary Judgment (Judgment as a Matter of Law) on the Issue of Defendants' Liability on all Counts on October 20, 1995. For the following reasons, Plaintiffs' Motion is denied.

Plaintiffs note in their Memorandum in Support of Their Motion for Summary Judgment that the defendants accepted as undisputed facts the deposition testimony of the plaintiffs. Defendants wrote that "for purposes of this motion only, the . . . Defendants will treat the statements made by the Plaintiffs in their depositions as constituting undisputed material facts in this case." Memorandum in Support of Defendants' Motion for Summary Judgment, p. 2. The Plaintiffs,

relying on that one sentence, argue that "[t]he Defendants cannot have it both ways—either there are factual disputes that the jury must resolve, or the facts are not in dispute and either the Plaintiffs or the Defendants are entitled to judgment as a matter of law." Plaintiffs' Memorandum, p. 4. The Plaintiffs' contention seems to be that since the Defendants have accepted the Plaintiffs' version of the facts as undisputed, for purposes of Defendants' Motion for Summary Judgment, the Plaintiffs are entitled to summary judgment on the issue of liability on all counts. The Court does not find this argument at all convincing.

Defendants stated that for purposes of their Motion for Summary Judgment, they would "*treat* the statements made by the Plaintiffs . . . as constituting undisputed material facts in this case." (Italics added.) This is far from an affirmative admission that the Plaintiffs' version of the facts are true, let alone an admission, express or implied, of Defendants' liability. Defendants are merely saying that *assuming* what the Plaintiffs have said is true, the Defendants are not liable for the reasons argued in their Motion for Summary Judgment. This is a common and standard approach to arguing a summary judgment motion. Defendants properly cited a section of Federal Practice and Procedure, which sets forth the black letter law with respect to this issue. That section states, in relevant part:

> . . . a party may argue that no issue exists in the hope that his legal theory will be accepted, but at the same time he may maintain that there is a genuine factual dispute in the event his theory is rejected or his opponent's is adopted. It should be remembered that a party moving for summary judgment concedes the absence of a factual issue and the truth of the nonmoving party's allegations only for purposes of his own motion. It follows that the legal theories the movant advances in support of his motion and his assertion that there is no issue of material fact may not be used against him when the court rules on his adversary's motion.

Wright, Miller & Kane, Federal Practice and Procedure: Civil 2d § 2720.

Therefore, the Court rejects Plaintiffs' argument that they are entitled to summary

judgment on the grounds that Defendants, in their motion, treated the Plaintiffs' version of the facts as undisputed. Furthermore, in light of the discussion and decisions presented on the preceding pages with respect to Defendants' Motion for Summary Judgment, Plaintiffs' Motion for Summary Judgment contains no other claims or arguments that would entitle them to any additional relief. For these reasons, Plaintiffs' Motion for Summary Judgment is denied.

### VII. CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment on the issue of the liability of the School Board and Gilbert as to Plaintiffs' claims under 42 U.S.C. § 1983 is GRANTED; Defendants' Motion for Summary Judgment on the issue of qualified immunity for McClung, Miller and Stewart is DENIED; Defendants' Motion for Summary Judgment as to Plaintiffs' claim of false imprisonment is GRANTED; Defendants' Motion for Summary Judgment as to the claim of battery is DENIED; Defendants' Motion for Summary Judgment as to Plaintiffs' claim of negligent infliction of emotional distress is DENIED; Defendants' Motion for Summary Judgment as to Plaintiffs' claim of intentional infliction of emotional distress is GRANTED; and Plaintiffs' Motion for Summary Judgment is DENIED.